### State v. Warren
*[Cite as 3 AOA 147]*

*Case No. L-89-044*
*Lucas County, (6th)*
*Decided May 25, 1990*

*Douglas A. Wilkins, for Appellant.*

*Anthony G. Pizza, Prosecuting Attorney, and John J. Weglian, for Appellee.*

HANDWORK, P.J.

Appellant, Charles Marquis Warren, brings this appeal from his conviction and sentencing in the Lucas County Court of Common Pleas on charges of abduction and felonious assault.

In October 1988, appellant was indicted by the Lucas County Grand Jury for one count of abduction in violation of R.C. 2905.02, one count of felonious assault in violation of R.C. 2903.11(A)(1), two counts of kidnapping in violation of R.C. 2905.01(A), and for one count of compelling prostitution in violation of R.C. 2907.21. Specifications were added to all five counts.

On February 1, 1989, appellant's trial in the Lucas County Court of Common Pleas commenced. A jury was selected, and counsel presented opening statements. Court was adjourned at the end of the statements and was reconvened the next morning. Prior to the return of the jury to the courtroom appellant's attorney presented a motion to the trial court, requesting a continuance for new counsel and a different judge. Appellant personally addressed the court, explaining that he felt uneasy with his current counsel because his current counsel had advised him to accept a plea bargain, even though appellant continued to contend he was innocent. Appellant believed that since his counsel was advising him to plead guilty and was indicating appellant could lose his case at trial, appellant's counsel was not capable of properly representing appellant. Appellant's counsel confirmed to the court that he had recommended that appellant accept a plea bargain. He denied stating that appellant would lose at trial, but confirmed he had informed appellant there was a good possibility of losing at trial. He further stated:

"* * * WHATEVER THE COURT'S DECISION HERE, I WILL GO FORWARD WITH MY BEST EFFORTS AND MY SOLE INTEREST IS CHARLES WARREN'S BEST INTERESTS."

Appellant also requested a new judge because he believed the current judge was familiar with one of the prosecution witnesses. The judge confirmed he did know of the witness, but indicated he would not know her if she entered the courtroom. The court then denied appellant's motion and ordered the trial to proceed.

Appellee presented seven witnesses who testified about events which occurred on August 1, 1988, and on October 16 and 17, 1988. Three of the witnesses were a grandmother, Clyde Bond, her daughter, June Boyd, and her granddaughter, Charlotte Boyd. The remaining four witnesses were Toledo police officers. Clyde's testimony related to the events which occurred on August 1, 1988, and which led to appellant's indictment on charges of felonious assault and abduction. Her version of the events which occurred on that date differed markedly from Charlotte's version. Clyde testified that she opened the door to her home at approximately 7:15 in the morning on August 1, 1988. Appellant was standing on her porch holding her newspaper. He identified himself and asked for Clyde's granddaughter, Charlotte. Clyde replied that Charlotte was still

asleep, whereupon, according to Clyde, appellant pushed his way into her home, striking her in the left eye, and knocking her to the floor where she fell on an electric fan. Clyde then testified that appellant forcibly removed Charlotte from Clyde's home, while Charlotte was saying, "Let me go."

Clyde testified that when she was knocked to the floor, she hit her head on the wall, and was temporarily unconscious. She also testified that when she fell on the electric fan, one arm received a cut. Upon cross-examination, appellant's counsel was able to show that the medical records from the hospital where Clyde sought treatment following this incident contained no indication that Clyde had received a cut to either arm, or had been given stitches for the cut as Clyde testified on direct examination. Cross-examination also revealed that there was nothing in the record to substantiate Clyde's testimony that following the incident she had suffered headaches, difficulty with her vision and watering eyes.

Charlotte was the second witness called by the prosecution. She testified that on the morning of August 1, 1988, appellant knocked on the door of Clyde's home, Clyde answered the door and allowed appellant into the home. Charlotte testified that she had lived with appellant, but that she had taken her daughter and gone to stay at her grandmother's home because she was angry at appellant for seeing another woman. Charlotte testified that when appellant entered Clyde's home, appellant and Charlotte began to argue. Clyde then tried to break up the fight. Charlotte went into the living room, picked up a ball and threw it at appellant. Appellant ducked and the ball hit Clyde in the left eye. Charlotte testified that while Clyde did grab her left eye, Clyde did not fall down. Charlotte testified that she willingly left Clyde's home with appellant and went to a hotel near I-280, where she and appellant made up. Charlotte then testified about events which occurred on October 16 and 17, 1988, all of which related to three counts which were dismissed by the trial court in response to a motion for a directed verdict from appellant's counsel. Following Charlotte's testimony regarding the events of August 1, 1988, and October 16 and 17, 1988, the following exchange occurred. Appellee asked:

"Q. CHARLOTTE, WHAT IS YOUR MARITAL STATUS?

"A. SINGLE.

"Q. WHAT ARE YOUR MARITAL INTENTIONS?

"A. I'M GETTING MARRIED THIS AFTERNOON."

Appellee then asked the court for permission to ask leading questions of Charlotte, and the jury was excused so that the court could entertain the motion. Appellant's counsel objected, arguing that the prosecution did not have any evidence to show surprise, a requisite for cross-examination of one's own witness with prior inconsistent statements pursuant to Evid. R. 607. Appellee countered, arguing that:

"HERE WE HAVE A WITNESS WHO BEGAN AT LEAST AS A VICTIM OF THE CRIMINAL OFFENSE, REPORTED THAT TO THE POLICE OFFICERS ON A COUPLE OF OCCASIONS AND AT THIS POINT HAS BECOME ALIGNED TO THE DEFENDANT. HER TESTIMONY TODAY INDICATES THAT SHE WISHES TO MARRY THE DEFENDANT AND SET A WEDDING DATE OF THIS AFTERNOON."

Appellee asked the court to declare Charlotte a hostile witness or a witness identified with an adverse party pursuant to Evid. R. 611(C) and to permit appellee to ask Charlotte leading questions pursuant to Evid. R. 611. Appellee further stated:

"* * * AND I WOULD ASK THE COURT TO UTILIZE ITS DISCRETION IN ALLOWING ME TO LEAD THE WITNESS. I'M NOT ATTEMPTING TO IMPEACH AT THIS POINT."

The court ruled that Charlotte was identified with an adverse party and allowed appellee to use leading questions over objections by appellant's counsel. After ruling on the motion, a short recess was taken, and the jury was returned to the courtroom. Appellee began asking leading questions of Charlotte, eliciting the information that she planned to marry appellant. Appellee then began questioning Charlotte about prior inconsistent statements she had made to a Toledo police officer. Appellant's counsel requested a limiting instruction, which the court gave. Specifically, the court stated:

"LADIES AND GENTLEMEN OF THE JURY, SOME OF THE QUESTIONS AND ANSWERS THAT WILL BE ELICITED DURING THIS PHASE OF THE STATE'S DIRECT EXAMINATION OF THIS WITNESS GO TO THE CREDIBILITY, AND THE ANSWERS AND QUESTIONS ARE NOT MATERIAL TO ANY OTHER ISSUE IN THIS CASE OTHER THAN TO TEST THE CREDIBILITY OF THIS

WITNESS, AND YOU SHOULD NOT CONSIDER THE ANSWERS FOR ANY OTHER PURPOSE OTHER THAN TESTING THE CREDIBILITY."

Appellee then extensively questioned Charlotte about prior inconsistent statements she had made to members of the Toledo police force and to her mother. The prior inconsistent statements contained allegations that appellant had forced Charlotte to commit acts of prostitution, that appellant had beaten Clyde, that appellant had forcibly removed Charlotte from Clyde's home, that appellant had kept Charlotte and her daughter Paige in his brother's home against their will, and that Charlotte and appellant had engaged in smoking crack cocaine together.

The next witness called by appellee to testify about events which occurred on August 1, 1988, was Officer Hubert Martin. Officer Martin responded to the call placed by Clyde to the Toledo Police Department on August 1, 1988. Officer Martin testified that he arrived at Clyde's home approximately three to four minutes after eight in the morning. Officer Martin testified that while Clyde indicated she was injured "* * * WE NOTICED NO SIGNS OF INJURY." The officer made a search of the surrounding area, and when he did not find appellant, returned to Clyde's home. Clyde indicated that she had made arrangements to go to the hospital, and the officers left. In his report, Officer Martin recorded an abduction and an assault. When questioned on cross-examination about why he had characterized the incident as assault, rather than felonious assault, Officer Martin replied "IT DIDN'T APPEAR THAT SHE HAD SERIOUS INJURY."

The next witness to testify regarding the events of August 1, 1988, was June Boyd. June testified that she had been out of town and was returning on August 1, 1988. She testified that when she arrived at her home sometime between 6:00 and 6:30 in the evening, she learned of her mother's injury. She also testified that she received a phone call from Charlotte, asking June to pick Charlotte up at a truck stop/restaurant on I-280. June did pick up Charlotte, and then she and Charlotte went to Clyde's home. June testified that both of Clyde's eyes were swollen closed and were black. June testified that Charlotte cried when she saw Clyde and told Clyde she was sorry, but that Charlotte did not indicate that she was the cause of Clyde's injury. On cross-examination, June testified that she and Charlotte had attended appellant's pretrial in this case. Appellant's counsel asked June whether Charlotte had indicated that she wanted to drop the charges against appellant and responded "OUTSIDE THE COURTROOM SHE SAID THAT." Appellant's counsel then followed up with the following question:

"TELL ME ABOUT THE CONVERSATION OUTSIDE THE COURTROOM.

"A. IT WAS BETWEEN SHE AND I AND HIS PAROLE OFFICER."

Appellant's counsel immediately moved for a mistrial at a bench conference held outside the hearing of the jury. Appellant's counsel argued the reference to appellant's parole was a violation of appellant's Fifth Amendment rights. The court overruled appellant's motion for a mistrial and the case proceeded.

The final witness who testified for the state regarding the August 1, 1988 incident was Detective Larry Wayne Scoble. Detective Scoble interviewed Charlotte on October 18, 1988. Detective Scoble testified about prior inconsistent statements Charlotte made to Detective Scoble at that time which indicated that appellant had dragged her from Clyde's home and had beaten Clyde on August 1, 1988.

As previously mentioned, at the close of the state's evidence, the court granted a directed verdict as to the two counts of kidnapping and the one count of compelling prostitution. The remaining counts, for abduction and felonious assault, were sent to the jury. The jury returned with guilty verdicts, and appellant was sentenced to consecutive terms of seven to fifteen years for felonious assault and three to ten years for abduction. Appellant now raises the following seven assignments of error:

"I. THE JURY'S VERDICT AND THE TRIAL COURT'S SENTENCE AS TO COUNTS 1 AND 2 WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

"II. THE LOWER COURT ERRED IN PERMITTING THE STATE TO IMPEACH ITS OWN WITNESS, CHARLOTTE BOYD, WITH PRIOR INCONSISTENT STATEMENTS ABSENT EVIDENCE OF SURPRISE AND AFFIRMATIVE DAMAGE IN VIOLATION OF RULE 607 OF THE OHIO RULES OF EVIDENCE.

"III. THE COURT ERRED IN NOT GRANTING DEFENSE COUNSEL'S MOTION FOR ACQUITTAL ON COUNT 1 SINCE CHARLOTTE'S TESTIMONY COULD NOT BE SUBSTANTIVELY ALTERED BY HER PRIOR INCONSISTENT STATEMENTS.

"IV. THE COURT ERRED IN NOT STRIKING TESTIMONY ELICITED FROM

ALL STATE'S WITNESSES CONCERNING PRIOR INCONSISTENT STATEMENTS MADE BY CHARLOTTE ON THE GROUNDS THAT THE TESTIMONY REPRESENTED IMPERMISSIBLE HEARSAY, AND, IN LIGHT OF CHARLOTTE'S DIRECT TESTIMONY, WAS FURTHER VIOLATIVE OF OHIO RULE OF EVIDENCE 607.

"V. THE COURT ERRED IN NOT GRANTING DEFENSE COUNSEL'S MOTION FOR MISTRIAL SINCE JUNE BOYD'S BLATANT REFERENCE TO APPELLANT'S PRIOR CRIMINAL ACTIVITY AND PAROLE VIOLATED APPELLANT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT, AND DENIED HIM HIS SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL TRIAL.

"VI. THE EVIDENCE WAS INSUFFICIENT, AS A MATTER OF LAW, TO FIND APPELLANT GUILTY OF COUNT 2, FELONIOUS ASSAULT.

"VII. THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT SUBSTITUTE COUNSEL AND/OR MAKING AN INQUIRY AS TO THE OBJECTION WITH TRIAL COUNSEL."

We begin by considering appellant's Assignment of Error No. II. Appellant argues that because appellee called Charlotte as its own witness, appellee was precluded by Evid. R. 607 from questioning Charlotte about prior inconsistent statements Charlotte may have made. Appellee counters by stating that Evid. R. 607 is not the only rule which is applicable to determine the method available to examine a witness. Appellee argues that Evid. Rs. 611 and 614 also applied in this case. The information in the record does not support appellee's contention that Evid. R. 614 applies to this case, since there is no indication that the court called Charlotte as a witness. Therefore, we need look only to the provisions of Evid. Rs. 611 and 607 to determine whether appellee's act of questioning Charlotte about prior inconsistent statements was permissible.

Evid. R. 611(A) contains general provisions granting the trial court "* * * reasonable control over the mode and order of interrogating witnesses and presenting evidence * * *." The court is granted that control to assist in the search for truth, to prevent unneeded delay, and to ensure that witnesses are not subjected to unnecessary harassment or embarrassment. In addition, Evid. R. 611(C) indicates when a court may properly allow a party to ask leading questions of a witness. Evid. R. 611(C) states in pertinent part:

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. *When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.*" Evid. R. 611(C). (Emphasis added.)

Appellee argues that because Charlotte was identified with an adverse party, namely, she was engaged to appellant, Evid. R. 611(C) applied and permitted the trial court to make a ruling which allowed appellee to ask Charlotte leading questions on direct examination. We agree with appellee that a party may ask leading questions of a witness called by that party when the party can demonstrate that the witness is hostile or is in some manner identified with the adverse party. Therefore, to the extent that the trial court granted appellee permission to ask Charlotte leading questions, the trial court did not err. However, as appellant contends, and as the record confirms, appellee was permitted to do far more than to ask mere leading questions. Appellee was permitted to impeach Charlotte with prior inconsistent statements that she had made.

Evid. R. 607 states:

"The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness *by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.* This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(A), 801(D)(2), or 803."

Thus, when appellee began to use leading questions pursuant to Evid. R. 611 for the purpose of impeaching Charlotte with prior inconsistent statements, appellee invoked the provisions of Evid. R. 607, and should not have been permitted to proceed absent a showing that it was surprised by Charlotte's changed testimony and a showing of affirmative damage to its case as a result of Charlotte's changed testimony.

Surprise exists in a case when the party calling a witness can demonstrate that the witness's testimony on the stand "* * * is materially inconsistent with the prior written or oral statements [of that witness] and counsel did not have reason to believe the witness would recant when called to testify." *State* v. *Stearns* (1982), 7 Ohio App. 3d 11, 15. Appellee contends it was

surprised by Charlotte's changed testimony at trial, and could not have reasonably anticipated what Charlotte would say since she had refused to divulge the exact statement she would make at trial. For the following reasons, we are not persuaded by appellee's contention. First, the record reflects that appellee knew prior to the time appellee called Charlotte to the stand that Charlotte intended to marry appellant. When appellee inquired of Charlotte about her marital intentions, she responded "I'M GETTING MARRIED THIS AFTERNOON." Following that response, appellee immediately requested permission to ask leading questions of Charlotte. During the discussion following appellee's request, appellee was the one who indicated to the trial court that the person Charlotte planned to marry was appellant. Second, and more importantly, both Charlotte and appellant's trial counsel indicated to the trial court that both Charlotte and appellant's trial counsel had personally spoken with appellee on more than one occasion prior to trial, beginning with three months before trial, and had informed appellee that Charlotte wanted the charges dropped. Specifically, appellant's trial counsel stated:

"BOTH PROSECUTORS MR. CONKLIN AND MR. BRUNO HAVE BEEN WELL AWARE OF CHARLOTTE'S POSITION AND WHAT HER STORY IS, SO THERE IS NO SURPRISE HERE * * *."

In addition, Charlotte testified on cross-examination that she had spoken with two prosecutors on the case and had informed them that she wished to drop the charges. When asked specifically what she had told the second prosecutor she replied "THAT I WASN'T GOING TO TESTIFY TO THOSE CHARGES. THEY WERE NOT TRUE." While Charlotte admitted that she had not told the prosecutor exactly what she did plan to say, the fact that she had indicated to the prosecutor that the charges were not true was enough to give the prosecutor reason to believe that she would recant her former statements. Accordingly, while it is in the trial court's sound discretion to determine whether surprise exists, *Ferguson Realtors* v. *Butts* (1987), 37 Ohio App. 3d 30, 33, the record in this case supports a finding that the trial court abused its discretion when it tacitly ruled that surprise existed, and permitted appellee to proceed to impeach Charlotte with her prior inconsistent statements. As the staff notes to Evid. R. 607 indicate, the reason for retaining the requirement that a party demonstrate surprise and affirmative damage

before the party can proceed to impeach its own witness with prior inconsistent statements of that witness is to prevent that party from calling "* * * a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment, thus doing indirectly what it could not have done directly." Appellant's second assignment of error is well-taken.

Appellant's fourth assignment of error is closely related to the issue raised in his second assignment of error and challenges the presentation of Charlotte's prior inconsistent statements to the jury through the testimony of June Boyd and Detective Scoble. Appellant argues that the logical extension of Evid. R. 607 and the ruling of the Supreme Court of Ohio in *State* v. *Holmes* (1987), 30 Ohio St. 3d 20, render the trial court's action of allowing appellee to question June Boyd and Detective Scoble about prior inconsistent statements made by Charlotte plain error. However, we decline to consider this error because appellant did not raise a specific objection at trial. *State* v. *Williams* (1977), 51 Ohio St. 2d 112, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 911. Appellant's fourth assignment of error is not well-taken.

Appellant's seventh assignment of error challenges the trial court's denial of appellant's motion for new counsel prior to trial. Appellant's own brief cites precedent which indicates that before a motion for new counsel must be granted, the person making the motion must establish that that person and their attorney have no communication, cooperation or trust. *State* v. *Pruitt* (1984), 18 Ohio App. 3d 50, 57. Appellant's own statements to the trial court as well as the statements by appellant's trial counsel do not support a finding that these conditions were met. Accordingly, appellant's seventh assignment of error is not well-taken.

Appellant's fifth assignment of error asserts that June Boyd's inadvertent reference to the presence of appellant's parole officer in a discussion held after pretrial so prejudiced appellant's case appellant was entitled to a mistrial. Appellant then discusses two cases in which courts declared plain error existed when witnesses accused the defendants of previously committing the same or similar crimes as those for which the defendants were standing trial. See *State* v. *Talbert* (1986), 33 Ohio App. 3d 282; *State* v. *Whitman* (1984), 16 Ohio App. 3d 246. Appellant then argues that he was similarly prejudiced by June Boyd's reference to the existence of

appellant's parole officer. We do not agree. A mistrial will be declared when "* * * there is a 'manifest necessity' to do so, or to serve 'the ends of public justice.' Furthermore, the trial courts are invested with authority to determine this issue in the exercise of their 'sound discretion.'" *State* v. *Abboud* (1983), 13 Ohio App. 3d 62, citing *United States* v. *Perez* (1824), 22 U.S. 579, 580. In this case there was no manifest necessity for a mistrial, as the trial court immediately rendered curative instructions There is a presumption regarding the efficacy of curative instructions which appellant has not overcome. See *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 61, certiorari denied (1988), 484 U.S. 1047. Appellant's fifth assignment of error is not well-taken.

Because our ruling on Assignment of Error No. II necessitates a reversal and a new trial, we need not discuss appellant's three remaining assignments of error. Accordingly, appellant's Assignments of Error Nos. I, III and VI are found not well-taken.

Having found that defendant was prevented from having a fair trial, the judgment of the Lucas County Court of Common Pleas is reversed. This case is remanded for new trial. Appellee is ordered to pay the court costs of this appeal.

*Judgment reversed.*

HANDWORK, P.J., GLASSER, J., ABOOD, J., concur.