This is an appeal from the judgment of the Hamilton County Court of Common Pleas convicting the defendant-appellant, Robert Jarvis, of two counts of rape pursuant to the guilty verdicts returned by a jury and the court's independent finding, on the specification attached to each count, that Jarvis had a prior conviction for murder.[1]
The allegations of rape were drawn pursuant to R.C.2907.02(A)(1)(c), and contained, inter alia, the following declaration with respect to the victim:
 Karen Carter's [a female not the spouse of the accused] ability to resist or consent was substantially impaired because of a mental or physical condition * * *, and the defendant knew or had reasonable cause to believe that Karen Carter's ability to resist or consent was substantially impaired * * *.
On June 30, 1997, the date specified in the indictment, Carter was some thirty-four years of age. It is uncontroverted that when she was less than a year old, she had an accident which resulted in injuries to her head, and that, in time, she began to demonstrate symptoms of epilepsy. Ultimately, her seizures were diagnosed by physicians in these terms:
 [They are] of the type we call grand mal seizures, meaning that she would have a sudden loss of consciousness without warning, fall to the ground and shake violently, and the seizures occurred at one time almost on a daily basis.
Carter was taken into the home of her maternal grandmother, Sophia Napier, when she was about nine months of age, was reared by Mrs. Napier and was living with her on June 30, 1997, in a multi-building apartment complex in Hamilton County. Mrs. Napier testified that when Karen Carter was in the first grade of elementary school, the severity of her epilepsy was such that she was unable to benefit from the efforts to educate her and she was removed from school. A tutor was obtained to attempt to educate her in her home, but after several months that effort was abandoned because, her grandmother testified, Karen "got so bad that she couldn't remember what she learned that day." Carter has never been employed or married and has spent her days reading simple, primary-grade books, coloring pictures and playing a child's game of cards by herself. Her grandmother permitted her to take walks through the apartment complex alone for no longer than thirty to forty-five minutes, with firm instructions to return home directly.
At about noon on June 30, 1997, Karen Carter was taking one of those walks when she met Jarvis as he was sitting near the complex's swimming pool. Although she had not previously seen Jarvis, a relatively new tenant there, the two began a conversation after Jarvis introduced himself. At that time, Jarvis was a fifty-two-year-old man who had established residence in the Cincinnati area sometime in February 1992. He was unemployed and suffered from post-traumatic stress disorder as a consequence of his military service in Vietnam between 1965 and 1970. When Jarvis testified in his own defense, he claimed that his stress disorder affected his ability to make judgments and to conform his behavior to the expected norms of society.
During their conversation, Carter accepted Jarvis's invitation to accompany him to his apartment to assist him in hanging pictures there. According to Carter's testimony, as the two were dancing to music from a radio inside the apartment, Jarvis suddenly threw her onto his bed and placed his body on top of hers. She stated that she panicked and lost consciousness, and that when she recovered her senses, her undergarments were wrapped around her ankles, and the bed linen was blood-soaked because she was in the course of her menstrual cycle. Jarvis allowed Carter to stand up and then cleanse herself with towels from his bathroom. As she returned to her home, she discarded the soiled towels in a trash receptacle.
Jarvis's version of the episode was that after some thirty minutes of conversation with Carter he went to his apartment, alone, to prepare for a visit from his "case manager" from the "Central Clinic," who had responsibility for monitoring his progress in recovery from his stress disorder. At times between 1994 and 1996, Jarvis was a patient at several facilities for treatment of his condition, and, apparently, he was being treated on an outpatient basis under the auspices of the Central Clinic.
Jarvis claimed that after he parted company with Carter she came to his apartment and knocked on his door. When he let her inside, they began kissing, touching each other and engaging in other forms of "sexual foreplay." Carter then left to return home without any sexual intercourse having occurred.
According to Jarvis, at approximately 5:00 p.m., Carter was again in the vicinity of Jarvis's apartment. She testified that he motioned for her to come inside again because the pictures had not yet been hung, but the versions of what occurred next differed markedly. Karen Carter testified that Jarvis threatened to carry her inside if she did not go voluntarily, and that once she went into the apartment, Jarvis took her into a large closet, raped her vaginally, and then would not permit her to leave. She testified further that Jarvis told her that he had already killed a man, and that if he (Jarvis) killed her (Carter), she would be the third person he had killed. By his own admission, Jarvis had murdered a man in West Virginia, and while imprisoned for that homicide, he murdered a guard during a prison riot in 1973.
Carter stated that after Jarvis told her that the only way she could leave his apartment was to engage in fellatio, she submitted to his demand. She testified that Jarvis raped her vaginally again before permitting her to leave. She arrived at her home at approximately 7:00 p.m. and, according to Mrs. Napier's testimony, was emotionally distraught and tearful and refused to speak. Finally, as her cries came louder and louder, Karen told her grandmother that she had been raped. Police were summoned and they attempted to interview Karen Carter. Ultimately, she was taken to a hospital to undergo a physical examination, which, inter alia, revealed evidence of bruising to her inner labia and vaginal area.
In contrast, Jarvis testified that Carter had entered his home willingly, that they engaged in various forms of conduct he characterized as sexual foreplay without sexual penetration of any kind, and that she left without interference.
Trial to the jury began on October 9, 1997, and concluded with the verdicts the following day. Antecedently, the court had granted Jarvis's motion to have the prior-conviction specifications tried to it rather than to the jury.
We are given these six assignments of error through the counsel Jarvis has retained to replace the counsel he had retained to represent him at trial:
 1. The trial court erred to the prejudice of Mr. Jarvis by admitting evidence of his prior murder convictions.
 2. The trial court erred to the prejudice of Mr. Jarvis by failing to declare a mistrial or strike the testimony of Karen Carter, after the prosecutor gave Ms. Carter signals during her cross-examination.
 3. The trial court erred to the prejudice of Mr. Jarvis by publishing Karen Carter's hospital records to the jury.
 4. Mr. Jarvis was denied the effective assistance of counsel in violation of his Sixth Amendment right to counsel and his Fourteenth Amendment right to due process.
 5. The trial court erred to the prejudice of Mr. Jarvis by overruling his repeated requests for a new attorney.
 6. The trial court erred resulting in prejudice to Mr. Jarvis when it imposed separate and consecutive sentences for the two counts of rape and attached specifications.
To support his first assignment, Jarvis submits that Evid.R. 609(A)(2) should have prevented the prosecution from adducing evidence of his prior convictions to impeach his testimony when the probative value of that evidence was outweighed by the danger of unfair prejudice to him.
The prosecution argues that a trial court possesses a broad range of discretion within the rule when determining the admissibility of prior convictions for impeachment purposes, and that the following factors set forth in State v. Goney
(1993), 87 Ohio App.3d 497, 501-502, 622 N.E.2d 688, 691, must be considered in that process:
 (1) the nature of the crime, (2) recency of the prior conviction, (3) similarity between the crime for which there was a prior conviction and the crime charged, (4) importance of the defendant's testimony, and (5) centrality of the credibility issue. [Emphasis added.]
We emphasize the fifth component because in the context of this case the prime consideration for the jury was the credibility of Jarvis and, in tandem, Carter. The prosecution agrees that it bore the burden to demonstrate that the probative value of the evidence of prior convictions outweighed the arguable prejudicial effect of them upon the minds of the trier of fact.
As we see the record, the evidence of the previous convictions served a purpose beyond that contemplated by Evid.R. 609, i.e., to attack Jarvis's credibility alone. Here, such evidence bolstered Carter's credibility, i.e., the obverse of the purposes of the rule. As this record stands, the only way Carter could have known of Jarvis's past criminal behavior was to have heard of it from him. She testified that he had told her that he had killed twice, a statement Jarvis denied categorically having made. Clearly, the members of the jury were entitled to consider those diametrically opposed statements when deciding whether to believe Carter's accounts of the events of June 30, 1997, or those espoused by Jarvis.
We are convinced that the court fully and fairly resolved the question whether the state had maintained its burden and that the court did not abuse its discretion in admitting the testimony touching upon the antecedent murders committed by Jarvis.[2] Resultantly, the first assignment is without merit and is overruled.
The second assignment of error, that the court improperly failed to declare a mistrial or to strike certain testimony, rests upon the assertion that the prosecutor "signalled answers to a mentally-challenged alleged rape victim [Carter]" and thereby restricted the cross-examination of her.
On the second day of trial, the court entertained argument, in the absence of the jury, on the motion for a mistrial that had been filed by defense counsel in writing that same morning. Counsel declared:
 As grounds for this motion, the Defendant states that the actions of Hamilton County Assistant Prosecutor Chris McEvilley in signalling answers to the chief prosecuting witness during the Defendant's cross-examination of that witness were actions that constituted suborning perjury. In addition, those actions worked to restrict the right of the Defendant to cross-examine a principal witness against him.
In his argument, defense counsel expanded his written allegation by stating:
 During the course of my cross-examination of that witness, I noticed several answers changed midstream. Based on that, I began to grow a little suspicious as to what was happening, and I began observing the prosecuting attorney at that time, and noticed a number of times [that she was] shaking her head no or nodding yes prior to the defendant answering questions, and the — or prior to the prosecuting witness answering the questions, and each time the prosecuting witness' answer then corresponded with either the no or yes signal by the prosecutor.
In response, the prosecutor said:
 Judge, when I was trying to prepare Karen Carter for cross-examination, and actually all of her family at the same time, I instructed Karen and the other members of her family to pause momentarily after the defense asks a question to give me the opportunity to object, and that if I did not object, to go ahead and answer the question.
 Karen being, in her own words, a slow thinker, would pause, I noticed, and look to me as to whether or not she should answer the question, and not what the answers to the questions were. I never once shook my head no. I may have nodded yes, only to indicate to Karen that she could go ahead and answer the question, not that the answer to the question was yes. She is mentally challenged, we would submit, and she didn't understand when she was supposed to answer and how long she was supposed to wait. She was merely looking to me for encouragement. When the defendant pointed out that I was, in fact, nodding, which I really didn't realize I was doing, I, at that minute and then from then on through the rest of her testimony, made a conscious effort not to nod, even though Karen would at times stare at me for several seconds, simply waiting for encouragement to answer.
In State v. Evans (1992), 63 Ohio St.3d 231, 240,586 N.E.2d 1042, 1051, a case in which the appellant had been found guilty of a capital murder by a jury and sentenced to death, the court wrote in its rejection of the appellant's claim that the conduct of the prosecutor deprived him of a fair trial:
 "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. * * *" State v. Maurer (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 793. See, also, State v. Smith (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883.
However disarming may be the prosecutor's declarations of her motive in nodding her head toward Carter during her responses under cross-examination, we do not and cannot condone her technique. Such a device invites needless risks, both at trial and upon appeal. Still, our disapproval does not resolve the essential question whether Jarvis's substantial rights were affected prejudicially. That resolution demands a determination whether, as the supreme court noted in State v. Evans, supra,
the record demonstrates that the outcome of the case clearly would have been different but for the conduct of the prosecutor.
There is nothing substantive in the record to indicate that any member of the jury observed the conduct of the prosecutor as described by defense counsel, or that the court, itself, saw anything out of the ordinary. From all that can be derived, the jury was unaffected and uninfluenced by any behavior on the floor or from the witness stand in response to it. The inquiry by the court into the matters broached by the motion for a mistrial was adequate to establish a factual basis upon which to proceed. The standard which we must apply in evaluating whether the court acted properly in denying the motion for a mistrial is whether there was an abuse of the sound discretion of the court. In State v. Widner (1981), 68 Ohio St.2d 188,190, 429 N.E.2d 1065, 1066, Chief Justice Celebrezze noted the reluctance of the United States Supreme Court to formulate precise, inflexible standards in evaluating whether a trial court has acted properly in ruling on a mistrial, and further indicated that deference should be given to the trial court's exercise of discretion in declaring mistrials by quoting the following language from United States v. Perez (1824), 9 Wheat. 579, 580:
 We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.
Finding no abuse of discretion evidenced by the record, we overrule the second assignment.
The third assignment questions the admission of the hospital records reflecting the examination of Carter on June 30, 1997, because, Jarvis argues, the prosecution failed to lay a proper foundation for their introduction.
When the exhibits in question were proffered to the court to be admitted, the prosecutor said:
 We would offer State's Exhibits 1 and 2, which were testified about, and Exhibit 3, which is Karen Carter's University Hospital medical records, copies of which were provided to the defense. We'd ask that those be admitted under the rule that allows records in the ordinary course of business.
The only part of the hospital record which defense counsel elected to question and ultimately asked to have stricken was a reference to "PT [patient] who is mentally challenged," because no "expert" had made such a diagnosis.
In response, the prosecutor advised the court that she intended to call two doctors to testify with respect to Carter's mental limitations, but had no objection to the "four words" to which counsel objected being redacted.
In its brief, the prosecution concedes that Evid.R. 803(6) required it to lay a foundation for the admission of the records and that they should have been authenticated as business records under Evid.R. 901. The basic authenticity of the records, however, was not challenged, and the reference to "mentally challenged" was redacted to obliterate that part of the exhibit before it reached the hands of the jury. That being so, we find neither an abuse of discretion by the court in receiving the exhibit as evidence to be submitted to the trier of fact, nor any form of prejudice to Jarvis. Therefore, we overrule the third assignment of error.
The fourth assignment of error, that Jarvis was denied effective assistance of counsel, is grounded on this proposition:
 A defendant is denied effective assistance of counsel when his trial counsel does not: (1) investigate an insanity defense or evaluate defendant's competence to stand trial, (2) investigate the competency of the state's primary witness who is mentally retarded, (3) obtain pre-trial ruling on the admissibility of the defendant's prior murder convictions, and (4) inform the defendant that, if he testifies, his prior convictions could be used to impeach him.
Jarvis recognizes that the standard of review this court must apply in evaluating his claims of lack of effective assistance from his trial counsel is that established in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Therefore, Jarvis concedes that he must demonstrate that the representation afforded him upon trial was deficient because it fell below an objective standard of reasonableness, and, that in turn, it resulted in prejudice to him.
As we held in State v. Kemp (Oct. 31, 1997), Hamilton App. No. C-960478, unreported:
 In Lockhart v. Fretwell (1993), 506 U.S. 364, 371, 113 S.Ct. 838, 843, 122 L.Ed.2d 180, the United States Supreme Court held that a showing of prejudice does not depend solely on whether the outcome of the trial would have been different but for counsel's error. It is rather an inquiry into whether "counsel's performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Id. at 371, 113 S.Ct. at 844. When reviewing trial counsel's performance, courts must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. See, also, State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
Jarvis's primary complaint is that his counsel upon trial failed to investigate or prepare a defense based upon insanity. The record shows that immediately after court was convened on October 9, 1997, his counsel said:
 Your Honor, Mr. Jarvis has just informed me that he no longer wishes to retain me as counsel. He wishes to change his plea to that of not guilty by reason of insanity plea, and wishes to hire another attorney to represent him in this matter, hire alternate counsel.
After the court determined counsel had been retained rather than appointed, counsel continued:
 Mr. Jarvis no longer believes that the defense that has been prepared over the last two months is what he wants to pursue. I'm clearly not ready to switch to NGRI in this situation, and if Mr. Jarvis wishes to hire alternate counsel, I will not stand in his way.
The prosecutor then informed the court of the somewhat halting progress of the case, the desire of the Carter-Napier family to go to trial on the date set months before, and the state of readiness of the prosecution to go forward, adding this:
 It was my understanding that his prior attorney tried to file an NGRI defense and the defendant did not wish him to pursue that. Now, at the 11th hour, he is seeking to do that, and we would object and ask that we go forward with trial.
The court denied Jarvis's request for a continuance, saying, cryptically to us, "I would allow him to enter that plea and we will go forward with trial today." As far as the record stands, however, no plea of not guilty by reason of insanity was made and the defense proceeded instead on the theory that Jarvis neither knew nor had reason to know of Karen Carter's lack of ability to resist or consent to any sexual encounter.
At this juncture, we believe it appropriate to note that Jarvis has appended to his brief his personal affidavit detailing communications with his trial counsel about his mental condition and hospitalizations, and the affidavit of one of his current counsel in this appeal regarding communications with that same attorney. In law, these affidavits can be given neither credence nor effect because they are not properly part of the record. A reviewing court cannot add matter to the record that was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.State v. Ishmail (1978), 54 Ohio St.2d 402, 377 N.E.2d 500.
The remaining particulars of the fourth assignment,viz., the competency of Carter, the admissibility of the convictions and their potential as evidence to impeach, do not serve to demonstrate professional conduct that did not satisfy an objective standard of reasonableness and that prejudiced Jarvis. The competency of Carter to testify as a witness, i.e.,
whether she had sufficient understanding to receive, remember and narrate impressions and comprehended the significance of the oath administered to her, was never challenged, nor, as we see the record, should it have been. Whatever may have been her handicap, it did not disqualify her, per se, as a witness, although it arguably may have affected the credibility of her testimony. Counsel's cross-examination of Carter was aggressive, probing, extended and designed to afford the jury the basis for doubting the accuracy of her recollections of the events of June 30, 1997.
The fact of the previous convictions was, and could not be, questioned. Given the facts of this case, counsel for Jarvis was faced with an invidious choice: either to keep Jarvis off the stand, which would have then left the state's version of events as the more forceful evidence, or to have Jarvis testify to give the jury a basis upon which to conclude that he was unaware, directly or indirectly, of any inability of Carter to consent or resist sexual advances. When all is considered, we see no derelictions of duty toward Jarvis by defense counsel. Therefore, the fourth assignment is overruled.
The fifth assignment of error, which asserts that Jarvis was prejudiced by the court's refusal to permit him to discharge his retained counsel and to obtain a new one, dovetails to some degree with the fourth assignment. Jarvis argues that:
 A defendant is denied his right to counsel and his right to a fair trial when the trial court denies the defendant's repeated requests for a new attorney, which are made due to obvious and prejudicial breakdowns in communications between current counsel and the defendant.
Jarvis, in support of his thesis, cites primarily State v.Prater (1990), 71 Ohio App.3d 78, 82, 593 N.E.2d 44, 46, in which the Court of Appeals for Franklin County cited the syllabus in State v. Deal (1969), 17 Ohio St.2d 17,244 N.E.2d 742:
 Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel, by stating that such counsel failed to file seasonably a notice of alibi or to subpoena witnesses in support thereof even though requested to do so by [the] accused, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record. The trial judge may then require the trial to proceed with assigned counsel participating if the complaint is not substantiated or is unreasonable.
The precept with which we must begin our analysis of the merits of the fifth assignment is set forth in State v. Pruitt
(1984), 18 Ohio App.3d 50, 57, 480 N.E.2d 499, 507, quotingUnited States v. Calabro (C.A.2, 1972), 467 F.2d 973, 986:
 In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict, which leads to an apparently unjust verdict.
The court in Calabro, supra, at 986, went on to give the appropriate standard of review to be applied in these words:
 If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right. * * * In the absence of a conflict which presents such a Sixth Amendment problem, the trial court has discretion to decide whether to grant a continuance during the course of trial for the substitution of counsel, and that decision will be reversed only if the court has abused its discretion.
See, also, State v. Grant (1993), 67 Ohio St.3d 465, 479,620 N.E.2d 50, 67; State v. Coleman (1988), 37 Ohio St.3d 286,575 N.E.2d 792, certiorari denied (1988), 488 U.S. 900,109 S.Ct. 250.
In order to demonstrate that the court abused its discretion when it denied his requests for the opportunity to retain new counsel, Jarvis must have shown with specificity that there existed no trust, communication or cooperation between his attorney and himself. State v. Warren (1990), 67 Ohio App.3d 789,798, 588 N.E.2d 905, 912; State v. Walker (1993), 90 Ohio App.3d 352,361-362, 629 N.E.2d 471, 477.
It must be said at the outset that the methodology employed below by the trial court in its disposition of Jarvis's "wishes" to change his plea and to hire another attorney is not a model to be followed by others and gives us little of substance from which to determine whether, in proceeding forthwith to trial, the court abused its discretion. What is clear from the record, however, is that Jarvis was mercurial, subject to mood swings, in his own words "paranoid," and prone to make rash, unfounded "accusations," had summarily discharged his original attorney, and had broached his dissatisfaction with his trial counsel through that individual himself without seeking or attempting to address the court personally only when the trial was imminent, i.e., when the jury was about to enter the courtroom. From this record, it is possible to infer that the trial court saw Jarvis's wishes as nothing more than a last-minute ploy to avoid the inevitable trial and not bona fide, justifiable dissatisfaction.
Coupling all of this with our holding that Jarvis was not denied effective assistance of counsel, we hold that Jarvis failed to meet his burden to show good cause for a substitution of counsel, such as a complete breakdown in communication or an immediate conflict between himself and his chosen counsel which led to an unjust verdict. Resultantly, we hold that he has failed to convince us that there exists an abuse of discretion below, and his fifth assignment is overruled for that reason.
The sixth assignment of error, that the court erred by imposing consecutive sentences for the separate convictions for the rapes in their disparate forms, is not well taken and is overruled. Upon the evidence which the jury was entitled to accept as credible, the two rapes were committed separately both spatially and temporarily. They were clearly committed under circumstances which bring the sentences within the ambit of State v. Jones (1997), 78 Ohio St.3d 12, 676 N.E.2d 80, which, as Jarvis concedes, is applicable. We decline his submission that Jones should be overruled.
Since none of the six assignments of error are well taken, the judgment of the Hamilton County Court of Common Pleas is affirmed.
Judgment affirmed.
HILDEBRANDT, P.J., DOAN and SHANNON, JJ.
RAYMOND E. SHANNON, retired, of the First Appellate District, sitting by assignment.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.
[1] Jarvis was sentenced to imprisonment for eight years on each rape and for five years on each specification, with the terms to be served consecutively.
[2] The court properly instructed the jury:
 [T]here was evidence that the defendant was previously convicted of a crime. You may consider this evidence insofar as it may help you to determine the credibility of the defendant. You may not consider it for any other purpose.