[Cite as *State v. Williams*, 2011-Ohio-5385.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95748**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DEANDRE WILLIAMS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-528916

**BEFORE:** Cooney, J., Stewart, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** October 20, 2011

**ATTORNEY FOR APPELLANT**

Jeffrey F. Kelleher
1540 Leader Building
526 Superior Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

By: Brent C. Kirvel
Sherrie S. Royster
Assistant County Prosecutors
9th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

COLLEEN CONWAY COONEY, J.:

**{¶ 1}** Defendant-appellant, Deandre Williams ("Williams"), appeals his convictions for murder and having a weapon under disability. We find no merit to the appeal and affirm.

**{¶ 2}** In September 2009, Williams was charged with murder in violation of R.C. 2903.02(A) and having a weapon under disability in violation of R.C. 2941.141(A). The

charges included one- and three-year firearm specifications. The case proceeded to a jury trial where the following evidence was presented.

{¶ 3} On September 11, 2009, the victim, Deontae Williams ("Deontae"), was attending an outdoor party in the front yard at 959 Eddy Road when Williams arrived with his friends Joseph Shephard ("Shephard") and Dennis Watkins ("Watkins"). Almost immediately, Williams, Shephard, and Deontae began to fight and, within minutes, Deontae was shot in the back. He died as result of this single gunshot wound. Williams admitted he caused the gun to fire but claimed it accidently discharged during the "tussle."

{¶ 4} At the conclusion of trial, a jury found Williams guilty of murder with the firearm specifications, and the court found him guilty of having a weapon under disability. The court sentenced Williams to 15 years to life in prison for murder plus an additional three years for the firearm specifications, to be served consecutively. It also sentenced Williams to three years for having a weapon under disability to be served concurrently with the murder conviction.

{¶ 5} Williams appeals, raising seven assignments of error, which we address out of order.

<u>Sufficiency and Manifest Weight of the Evidence</u>

**{¶ 6}** In the fifth and sixth assignments of error, Williams argues the evidence was insufficient to support the murder conviction and that the murder conviction was against the manifest weight of the evidence.

**{¶ 7}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 942, paragraph two of the syllabus.

**{¶ 8}** A challenge to the manifest weight of the evidence attacks the verdict in light of the State's burden of proof beyond a reasonable doubt. *Thompkins* at 386-387. A reviewing court may reverse the judgment of conviction if it appears that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. A finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Id. at 388.

**{¶ 9}** Williams contends "no rational trier of fact could find that the essential element, 'purposely cause the death,' was proven beyond a reasonable doubt." He claims there is simply no evidence that Williams purposely caused Deontae's death.

{¶ 10} Several of Williams's friends testified that Williams offered Deontae a friendly handshake when he arrived, but Deontae rebuffed him and reached for a gun in his waistband. Fearing that Deontae might shoot them, Williams tried to grab the gun from Deontae and, as they struggled, the gun discharged accidently. However, several other unbiased witnesses told a different story.

{¶ 11} Two teenage neighbors, who observed the shooting from their front porch testified that Williams arrived with his friends and crossed the street to the party. One of the teenagers described them as follows:

> "They was looking like they was up to something * * * a car pulled up and the way they was looking, I'm like that don't look right."

{¶ 12} Another witness testified that five seconds elapsed between the time the men exited their car and then "attacked" Deontae. Neither witness mentioned any attempt at a friendly handshake.

{¶ 13} One of the teenagers further explained that she immediately went into the house when she saw them approach Deontae because she "thought they were going to shoot." When she peered from the window moments later, she saw "one of them had him in a headlock. All of sudden two of them had moved away and the gun shot went off and he fell." This testimony suggests that Williams's friends knew that Williams was going to shoot because they moved out of harm's way just in time. The teenager also believed the gunshot "was * * * through the back."

{¶ 14} Brandy Anderson ("Anderson"), another independent witness, corroborated the teenagers' story. She and her friend Taleema Townes ("Townes") were on their way to a restaurant and stopped briefly at the party because Townes needed to use the restroom. Anderson, who did not know anyone at the party, waited in the car, which was parked in the driveway of 959 Eddy Road. While she was waiting, she heard Williams's car arrive. She explained that Deontae was alone by the curb when two to three men surrounded him and grabbed him "by his neck and they were strangling him." She testified, "It was quick. I heard car doors open. I heard people talk loud, and immediately someone said he got a gun." By the time she heard about the gun, the men were already choking him and "he was off the ground." A moment later, he was shot in the back.

{¶ 15} Further, Williams's claim that Deontae tried to pull the revolver from his waistband prior to the fight is not supported by the objective findings of the State's forensic witnesses. Curtis Jones ("Jones"), a trace evidence expert with the coroner's office, testified that he found no trace metal on Deontae's hands after conducting a trace metal detection test. If Deontae had handled a metal object, such as the revolver, there would be trace metal found on his hands.

{¶ 16} Jones also testified that he found blast destruction and fouling on Deontae's shirt that indicated the gun was in contact with the fabric of his shirt when it fired. The gunshot penetrated Deontae's upper left side of his back, one inch from his spine. The

coroner testified that the bullet traveled straight through to his chest and perforated his aorta and heart and stopped under the skin of his chest. It is hard to imagine how an accidental shot could have occurred at this angle and in this location of Deontae's back.

{¶ 17} Moreover, during the State's cross-examination of Williams's girlfriend, Ebony Foster ("Foster"), the State played excerpts of recorded conversations Foster had with Williams while he was in the county jail. In one excerpt, he confessed, "I'm not trying to sugarcoat anybody. I'm the man that pulled the trigger." Pulling the trigger indicates an intentional act rather than an accident. Although Williams claimed he was trying to grab the gun when it accidently discharged, the record is replete with evidence from unbiased witnesses and a confession from Williams himself, indicating that he purposefully pulled the trigger and killed Deontae.

{¶ 18} Therefore, the fifth and sixth assignments of error are overruled.

Cross-Examination of State Witnesses

{¶ 19} In the first assignment of error, Williams argues the trial court deprived him of a fair trial by permitting the State to cross-examine some of its own witnesses. In the third assignment of error, Williams argues he was deprived of a fair trial as a result of prosecutorial misconduct involving the impeachment of the State's own witnesses and the impugning of defense counsel. Williams contends the prosecutor improperly used leading questions during direct examination of certain witnesses to suggest that they

conspired to give false evidence. He claims this tactic violated the rules of evidence and his right to due process.

{¶ 20} The decision to allow leading questions in the direct examination of a witness is within the trial court's discretion. *Ramage v. Cent. Ohio Emergency Serv., Inc.,* 64 Ohio St.3d 97, 1992-Ohio-109, 592 N.E.2d 828, paragraph six of the syllabus. Generally, a party must show that a witness is either hostile or identified with the adverse party in order for the court to permit leading questions on direct examination. The ability of counsel to cross-examine its own witness by the use of leading questions is governed by Evid.R. 611(C), which states:

> "Leading questions should not be used on the direct examination of a witness except as is necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

{¶ 21} Williams argues the trial court should not have allowed the State to use leading questions to interrogate its own witnesses because there was no showing of hostility or surprise. Traditionally, a "hostile witness" is one who surprises the calling party at trial by turning against him while testifying. The traditional "hostile witness" is addressed under Evid.R. 607.

{¶ 22} An "adverse witness" is one who identifies with the opposing party because of a relationship or a common interest in the outcome of the litigation. *State v. Dolce* (1993), 92 Ohio App.3d 687, 703, 637 N.E.2d 51. Evidence of a long-term relationship

between a witness and the defendant or another reason for a strong affinity between a witness and defendant may be a sufficient basis for a court to allow the state to ask leading questions of a witness on direct examination. Id.; *State v. Stearns* (1982), 7 Ohio App.3d 11, 14, 454 N.E.2d 139. However, a prosecutor may not use leading questions to impeach the witness with prior inconsistent statements, absent a showing of surprise or affirmative damage. *State v. Warren* (1990), 67 Ohio App.3d 789, 588 N.E.2d 905.

{¶ 23} The test regarding prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶121, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." Id., quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the misconduct. *State v. Treesh*, 90 Ohio St.3d 460, 464, 2001-Ohio-4, 739 N.E.2d 749.

{¶ 24} We agree that the State impeached some of its own witnesses by showing that they had met and discussed Williams's case with defense counsel before making statements to police. The State further discredited these witnesses and corroborated its conspiracy theory by playing recordings of jailhouse phone conversations between

Williams and Foster in which Foster told Williams that Shephard did not follow their instructions and gave an incriminating statement. In another conversation, Williams told Foster what his friends should say in their statements and testimony. He instructed Foster as follows:

> "Basically you can tell him he didn't see that. You know what I'm say'in? * * * but basically * * * ya know robbery gone bad ya what I say'in and then he didn't see that part.
>
> * *
>
> "Alright look, when you talk to him tell him um that the word on the street is that they was try'in they was gonna rob me but you know how to get the people to come forward and say it but I will be able to. When I get out I be able to get them to come forward."

{¶ 25} The State also called one witness, Marcus Apernathy ("Apernathy"), who was not present at the party and did not witness the shooting. The State called Apernathy for the sole purpose of establishing the conspiracy to provide false evidence because he had no personal knowledge of the facts surrounding the shooting. Using leading questions, the State established that Apernathy met with Williams's lawyer before volunteering a statement to police about what he had heard about the shooting.

{¶ 26} Furthermore, although these witnesses had a long-standing friendship with Williams, they cooperated with the State during interrogation. Shephard was the only witness who provided a prior inconsistent statement. Because none of the testimony surprised the State or caused affirmative damage, we agree the State's impeachment of its

own witnesses violated Evid.R. 611(C) and was improper. However, we find the error harmless.

**{¶ 27}** Crim.R. 52(A), which governs harmless error, provides that"[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). Overcoming harmless error requires a showing of undue prejudice or a violation of a substantial right.

**{¶ 28}** As previously explained, the record is replete with evidence establishing that Williams purposely pulled the trigger and killed Deontae. The two teenage neighbors and Anderson were unbiased witnesses who were not "friendly" with either Deontae or Williams. Their testimony corroborates one another and demonstrates that Williams immediately attacked Deontae upon his arrival on the scene. Their testimony further indicates that Williams's associates moved out of harm's way just before the shot was fired, suggesting they knew it was coming. Moreover, Williams admitted pulling the trigger. Thus, even if the State had not called any of Williams's friends as witnesses or suggested that they conspired to testify to the same false story, the jury would still have found Williams guilty beyond a reasonable doubt.

**{¶ 29}** Therefore, the State's impeachment of its own witnesses, even if error or misconduct, was harmless.

**{¶ 30}** Accordingly, the first and third assignments of error are overruled.

<u>Lesser Included Offense Instruction</u>

{¶ 31} In his second assignment of error, Williams argues the trial court deprived him of a fair trial by not charging the jury on the lesser included offense of voluntary manslaughter.

{¶ 32} If a requested instruction contains a correct statement of the applicable law and is appropriate under the facts, the instruction must be included, at least in substance. *State v. Nelson* (1973), 36 Ohio St.2d 79, 303 N.E.2d 865, paragraph one of the syllabus. However, the corollary of this maxim is also true. The trial court must not instruct the jury where there is no evidence to support the instruction. *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 348 N.E.2d 135, paragraph two of the syllabus; *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828. "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of an * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Feterle v. Huettner* (1971), 28 Ohio St.2d 54, 275 N.E.2d 340, at syllabus.

{¶ 33} "'[T]he evidence presented in a particular case is irrelevant to the determination of whether an offense, as statutorily defined, is necessarily included in a greater offense.'" *State v. Barnes*, 94 Ohio St.3d 21, 26, 2002-Ohio-68, 759 N.E.2d 1240, quoting *State v. Kidder* (1987), 32 Ohio St.3d 279, 282, 513 N.E.2d 311. However, the evidence in a particular case is relevant in determining whether a trial judge should

instruct the jury on the lesser included offense. If the evidence is such that a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense, then the judge should instruct the jury on the lesser offense. *State v. Shane* (1992), 63 Ohio St.3d 630, 632-633, 590 N.E.2d 272.

{¶ 34} Williams contends the trial court erred in giving a lesser included offense instruction on involuntarily manslaughter, but not voluntary manslaughter. Voluntary manslaughter is not a lesser included offense but an inferior degree of murder, because "'its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements * * *.'" *State v. Deem* (1988), 40 Ohio St.3d 205, 209, 533 N.E.2d 294; *State v. Rhodes* (1992), 63 Ohio St.3d 613, 617, 590 N.E.2d 261. Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. *Rhodes* at 617. Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. *Deem* at 211; *State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286. However, when the evidence presented at trial does not meet this test, a charge on the inferior-degree (or lesser included) offense should not be given. *Kidder* at 282-283.

{¶ 35} Voluntary manslaughter is defined in R.C. 2903.03(A) as follows:

{¶ 36} "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]"

{¶ 37} Before giving a jury instruction on voluntary manslaughter in a murder case, the court must determine whether there was evidence that the victim sufficiently provoked the defendant to warrant such an instruction. *Shane* at paragraph one of the syllabus. "The trial judge is required to decide this issue as a matter of law, in view of the specific facts of the individual case. The trial judge should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." Id. at 637, citing *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303. "An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components." *Shane* at 634.

{¶ 38} When determining whether provocation was reasonably sufficient to induce sudden passion or sudden fit of rage, the court must apply an objective standard. Id. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. On the other hand, if insufficient evidence of provocation is presented so that no reasonable jury would decide that the victim reasonably provoked the defendant, the court must, as a matter of

law, refuse to give a voluntary manslaughter instruction. *Shane* at 634. The subjective component of the analysis requires an assessment of whether the defendant was actually under the influence of sudden passion or in a sudden fit of rage. Id. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 1998-Ohio-375, 694 N.E.2d 1328. Mere words also do not constitute sufficient provocation in most situations. Id. at 637.

{¶ 39} Viewing the evidence in a light most favorable to Williams, we find there was insufficient evidence that Williams was acting under the influence of sudden passion or in a sudden fit of rage. Williams's friends suggested that he was afraid because Deontae was retrieving a weapon from his waistband. However, fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or a sudden fit of rage. Id. Moreover, Williams never claimed he was provoked into a sudden fit of rage but rather claimed it was an accident. Therefore, the trial court properly denied the requested instruction on voluntary manslaughter.

{¶ 40} The second assignment of error is overruled.

## Ineffective Assistance of Counsel and Cumulative Error

{¶ 41} In his fourth assignment of error, Williams argues he was denied his Sixth Amendment right to the effective assistance of counsel. He contends his trial counsel was ineffective for failing to object when necessary, failing to move for a mistrial after the State improperly impeached its own witnesses, and failing to seek a voluntary manslaughter instruction. In his seventh assignment of error, he argues cumulative errors deprived him of a fair trial. We address these two assigned errors together.

{¶ 42} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 692. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

{¶ 43} Pursuant to the cumulative error doctrine, the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 2000-Ohio-448, 721 N.E.2d 52, citing *State*

*v. DeMarco* (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256. To find cumulative error, we first must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors. *State v. Williams*, Cuyahoga App. No. 94261, 2011-Ohio-591, ¶25.

{¶ 44} Although Williams's trial counsel did not state a continuing objection to the State's impeachment of its own witnesses, we determined that error, by itself, was harmless in light of the overwhelming evidence of guilt. The motion for mistrial was based on the same error and is, therefore, also harmless. Because the evidence presented at trial did not warrant a jury instruction on voluntarily manslaughter, counsel was not ineffective for not pursuing such an instruction, and there was also no error in the court's failure to give the instruction. Therefore, we find Williams was not deprived of his right to a fair trial and the outcome of the trial would not have been different if defense counsel had objected and moved for a mistrial.

{¶ 45} Accordingly, the fourth and seventh assignments of error are overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
COLLEEN CONWAY COONEY, JUDGE

MELODY J. STEWART, P.J., and
SEAN C. GALLAGHER, J., CONCUR