[Cite as *State v. Johnson*, 2024-Ohio-5098.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                :

                            No. 113591

    v.                                            :

DEMARKCO JOHNSON,                         :

    Defendant-Appellant.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 24, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-674068-A, CR-23-683589-A, and CR-23-683800-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory Mussman, Brandon A. Piteo, and Samantha M. Sohl, Assistant Prosecuting Attorneys, *for appellee.*

Allison F. Hibbard, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Demarkco Johnson ("Johnson"), appeals his convictions and claims the following errors:

> 1. The trial court abused its discretion in denying appellant's request for a jury instruction on entrapment.

2.  The trial court erred in failing to admonish and/or instruct the witness to stop answering questions with a legal conclusion after defense counsel had objected.

3. Appellant's convictions are against the manifest weight of the evidence; therefore, his convictions are in violation of the Ohio state constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

{¶ 2} We affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 3} In August 2023, Johnson and codefendant, Von E. Harris ("Harris") (collectively "defendants"), were charged with two counts of conspiracy, three counts of bribery, eight counts of forgery, one count of insurance fraud, one count of identity fraud, and one count of engaging in a pattern of corrupt activity.  The two conspiracy charges included furthermore clauses alleging that the object of the conspiracy was to engage in a pattern of corrupt activity.  The engaging in a pattern of corrupt activity charge included a furthermore clause alleging that at least one of the incidents of corrupt activity was a felony of the third degree or higher.

{¶ 4} The case against the defendants proceeded to a jury trial.  George Michael Riley, Sr. ("Riley"), testified that he became a confidential source for the Federal Bureau of Investigation ("FBI"), which was investigating corruption in the East Cleveland Police Department.  Riley had operated a demolition business in East Cleveland ("East Cleveland" or "the city"), and he was acquainted with several individuals in the police department.

{¶ 5} Special Agent Shaun Roth ("Roth"), an agent with the FBI working with the Cleveland Metropolitan Anticorruption Task Force, testified that the FBI

executed a search warrant for one of Riley's properties. Riley's attorney later contacted the FBI to set up a proffer interview with Riley in November 2017. A proffer interview allows an individual such as Riley to provide "protected statements" that cannot be used against him as long as they are truthful. (Tr. 1026.) They allow an individual to avoid criminal liability by assisting law enforcement.

{¶ 6} Riley provided two proffered interviews in November and December 2017. In the second statement, Riley told the investigators that he and Harris had a "quid pro quo" relationship wherein Harris performed "services" in exchange for money. Harris's services included running Riley's name in police databases to check for warrants and blocking off city roads so Riley could move his demolition equipment throughout the city. (Tr. 1029-1030.) Riley also called Harris if one of his drivers was pulled over, and Harris would "have the problem taken care of." (Tr. 1030.)

{¶ 7} In April 2018, two of Riley's trucks were stolen from his business on Elderwood Avenue in East Cleveland. Riley told his contacts at the FBI, and FBI officials instructed him to file a police report with the East Cleveland police just as any other victim would do. (Tr. 1032.) However, because he was going to make contact with the city, the FBI decided to use him as a confidential source. Riley cooperated with the FBI and agreed to have his cell phone monitored. (Tr. 1033, 1041.) He also allowed the FBI to install cameras in his truck to record the interactions he had with city officials.

{¶ 8} Acting as a confidential source, Riley contacted Harris to report his stolen vehicles. (Tr. 1034.) In a recorded phone call played for the jury, Riley asks Harris "how much it costs to run a license plate?" Riley testified that such a question was "normal business in East Cleveland." (Tr. 686.)

{¶ 9} A month later, Harris told Riley that he had a license plate for a vehicle that may be related to the theft of Riley's vehicles, and Riley asked if Harris could run the plate. (Tr. 1034.) By this time, Harris was no longer working as a police officer due to an injury and he needed the assistance of a police officer who was still employed by the department. The FBI obtained Harris's cell phone records pursuant to a subpoena and discovered that he called Johnson almost immediately after Riley asked him if he could run the plate. (Tr. 1036.) Days later, Riley again contacted Harris to inquire about a bus that was also stolen from his business.

{¶ 10} Roth authenticated several audio and video recordings of Riley's interactions with Harris, Johnson, and other city employees. In one phone recording from June 7, 2018, which was marked as State's exhibit No. 502, Harris is heard telling Riley to give someone $150 for her help preparing an incident report. Harris is also heard telling Riley to give another individual $200 for doing the report. Roth testified, and the recording confirms, that the idea of these payments originated with Harris. (Tr. 1039.)

{¶ 11} In accordance with Harris's instructions, Riley traveled to northeast Ohio with the money to pay the individuals who prepared the reports. (Tr. 1040.) Riley arranged to meet Harris at the East 55th Diner, and FBI agents set up

surveillance at the scene. Roth authenticated video footage taken of the June 13, 2018 meeting. The video footage, marked as State's exhibit No. 2, shows a hand-to-hand transaction between Riley, who is seated in the driver's seat of his truck, and Harris, who is standing outside the driver's side window. Referring to the video, both Roth and Riley testified that Harris handed him a police report for the bus stolen from Riley's property. (Tr. 1061.) In exchange for the report, Riley gave Harris $200. The video footage further shows that a woman, later identified as Kawanga Patrick ("Patrick"), approached Riley's truck and Riley handed her something. At trial, Riley and Roth testified that Riley gave Patrick $200. (Tr. 1047, 702-704.)

{¶ 12} Roth testified that after the meeting at the East 55th Diner, Riley and Harris later drove to the East Cleveland Police Department so that Riley could pay another individual who wrote the report. Video surveillance shows Harris introducing the other individual as "Nevels." However, the FBI later determined that the person introduced as Task Force Officer Wilbert Nevels was actually Johnson. Video footage of this encounter shows Riley shaking Johnson's hand and giving him $200 in cash. (Tr. 712, 1077.) Before Harris and Johnson walk away, Riley tells them that he has "a bonus" for them if they can find the bus that was stolen from his property. (Tr. 714.)

{¶ 13} On June 20, 2018, Riley again met with Harris and Johnson at a gas station in East Cleveland. (Tr. 1088, State's exhibit No. 200.) During this encounter, Riley gave Johnson an additional $200 in exchange for two East

Cleveland police reports concerning the two vehicles that were stolen from Riley's property. (Tr. 1104-1107, State's exhibit Nos. 202-203.) The reports were purportedly signed by Nevels. However, Wilbert Nevels testified at trial that he did not create these reports. He also stated that the signatures on the reports were not his signatures. (Tr. 993.) Roth testified that he conducted a search of the alleged stolen vehicles' VIN numbers in the Law Enforcement Automated Data System ("LEADS") and discovered that although the vehicles were reported stolen, the vehicles were never actually entered into LEADS. LEADS allows other law enforcement agencies to assist in locating stolen vehicles. (Tr. 1106.)

{¶ 14} After paying Johnson at the gas station, Riley drove with Harris to the East Cleveland City Hall, where Riley paid another city official $100. He then drove Harris home, where he gave Harris $300. (Tr. 1089.)

{¶ 15} Riley again met with Harris and Johnson at a different gas station on July 24, 2018. In this meeting, Harris and Johnson gave Riley false police reports detailing the recovery of the stolen vehicles in exchange for $500 each. (State's exhibit Nos. 301-304, tr. 751 and 1109-1110.) A videorecording of this meeting captured a conversation between Riley and Johnson wherein Riley asked if the reports are "the real deal," meaning that they did not look fake. (Tr. 751, State's exhibit No. 301.) Riley had told them that he intended to submit the reports to his insurance company to recover for "damage" to the vehicles. Johnson assured Riley that the reports would appear legitimate for purposes of the insurance claims. (Tr. 752 and 118-119; State's exhibit No. 301.) Riley told Harris and Johnson that

his truck was worth $20,000-$25,000, and he promised to give them more money when he eventually received the insurance payout. (Tr. 752.)

{¶ 16} Roth testified that he investigated the police reports Riley received from Harris and Johnson. The reports provided on June 20, 2018, and depicted in State's exhibit Nos. 202 and 203, describe the theft of two of Riley's vehicles. (Tr. 1104-1108.) However, Roth's investigation revealed that these "stolen vehicles" were never entered into LEADS. LEADS allows other law enforcement agencies to assist in locating stolen vehicles. (Tr. 1106.) Roth also interviewed Wilbert Nevels, whose signature appeared on the reports, and he discovered that the signatures were forgeries. (Tr. 993, 1107.)

{¶ 17} The recovery reports provided on July 24, 2018, indicated that the recovered vehicles were towed by a company in Akron and signed by one "Officer Coleman badge 921" of the Akron Police Department. (Tr. 1129.) Roth inquired of the Akron Police Department and learned that "[t]here was no Officer Coleman badge 921." (Tr. 1129.) Roth also called the tow-truck company listed in the reports and found that the vehicles were never towed by that company. (Tr. 1129.)

{¶ 18} Finally, Roth interviewed Johnson as part of his investigation. The interview was recorded and entered into evidence as State's exhibit No. 400. (Tr. 1136.) During the interview, Roth and another FBI agent confronted Johnson with video evidence of him meeting with and accepting cash from Riley on multiple occasions. They also showed him the video wherein Johnson assured Riley that the reports would appear legitimate. (Tr. 1136-1148, State's exhibit No. 400.) After

seeing the video evidence, Johnson apologized to Roth for "lying." (Tr. 1149, State's exhibit No. 400.)  Roth also described the interview he took of Harris in which Harris also admitted he received money from Riley and that he gave some of it to Johnson.

{¶ 19} After hearing the evidence, the jury found Johnson guilty of two counts of bribery in violation of R.C. 2921.02(B), as alleged in Counts 5 and 10 of the indictment.  The jury acquitted him of all other charges.  The court sentenced Johnson to 12 months in prison on both counts and ordered that the two prison terms be served concurrently.  Johnson now appeals the trial court's judgment.

## II.  Law and Analysis

### A. Entrapment Instruction

{¶ 20} In the first assignment of error, Johnson argues the trial court erred in denying his request for a jury instruction on the defense of entrapment.

{¶ 21} We review a trial court's refusal to give a particular jury instruction for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, ¶ 30 (8th Dist.), citing *State v. Leonard*, 2013-Ohio-1446, ¶ 33.  An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority.  *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 22} A requested jury instruction should be given if it contains a correct statement of the law, is appropriate to the facts, and reasonable minds could reach the conclusion sought by the instruction.  *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991); *State v. Nelson*, 36 Ohio St.2d 79 (1973), paragraph one of the

syllabus. However, the trial court should not instruct the jury on a particular issue where there is no evidence to support it. *State v. Williams*, 2011-Ohio-5385, ¶ 32, citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976).

{¶ 23} Entrapment is an affirmative defense. *State v. Carver*, 2022-Ohio-3238, ¶ 12 (8th Dist.). The party asserting an affirmative defense bears the burden of establishing the defense by a preponderance of the evidence. R.C. 2901.05(A); *State v. Doran*, 5 Ohio St.3d 187, 193-194 (1983); *State v. Marquand*, 2014-Ohio-698, ¶ 20 (8th Dist.) ("Because the defense of entrapment is an affirmative defense, the burden of production and the burden of proof, by a preponderance of the evidence, is on the defendant.").

{¶ 24} "Entrapment is a 'confession and avoidance' defense in which the defendant admits committing the acts charged, but claims that the criminal design arose with the state's agent." *State v. Ellison*, 2003-Ohio-6748, ¶ 17 (6th Dist.). To establish an entrapment defense, the evidence must show that the criminal design originated with government officials, that the government officials implanted in the mind of an innocent person the disposition to commit the alleged offense, and that government officials induced the commission of a crime in order to prosecute the defendant. *Doran* at 192. There is no entrapment when government officials "merely afford opportunities or facilities for the commission of the offense" to a criminal defendant who was predisposed to commit the offense. *Id.*

{¶ 25} In *Doran*, the Ohio Supreme Court was asked to determine whether Ohio law should define entrapment pursuant to a "subjective" test or an "objective"

test. *Doran* at 190. The Court explained that a "subjective test of entrapment focuses upon the predisposition of the accused to commit an offense." *Id.* By contrast, an objective test "focuses upon the degree of inducement utilized by law enforcement officials and whether an ordinary law-abiding citizen would have been induced to commit an offense." *Id.* The Ohio Supreme Court adopted the "subjective" test, finding it more reliable because it "properly emphasizes the accused's criminal culpability and not the culpability of the [government agent]." *Id.* at 191-192.

{¶ 26} In applying the subjective test of the entrapment defense, the *Doran* Court identified the following nonexhaustive list of factors to consider:

> (1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity.

*Id.* at 192. "No one factor controls over another." *State v. Carver*, 2022-Ohio-3238, at ¶ 12.

{¶ 27} There was no evidence that Johnson previously engaged in any criminal conduct. However, Johnson's acquiescence was demonstrated through Riley's testimony and the video footage of him accepting money in exchange for his help in creating false police reports. There is no evidence that Johnson hesitated when Riley asked for the reports nor was there any evidence that he objected when Harris introduced him to Riley as Nevels. And there is also no evidence that

Johnson manipulated in some fashion nor that he needed to be persuaded to cooperate with the plan to create the reports. Johnson seemed happy to accept Riley's money, and he accepted it on more than one occasion. The video evidence showed Johnson handing Riley reports in exchange for money on multiple occasions. Johnson's conduct demonstrated a ready acquiescence to the inducements offered by the government's confidential source and a willingness to become involved in criminal activity in exchange for money.

{¶ 28} The evidence also showed that Johnson had expert knowledge in the area of the criminal activity involved. As a trained police officer, he knew the protocol for filing police reports. He also knew to use handwritten forms that would not be filed and, therefore, were not likely to be discovered. Nevels testified that the East Cleveland Police Department no longer uses handwritten police reports but that they keep blank forms in the event the computer system they now use stops working. (Tr. 988.) Nevels further explained that handwritten reports are not automatically entered into the computer system. (Tr. 1002.) Moreover, the blank police report forms were readily available "under the front desk" at the police department. (Tr. 988.)

{¶ 29} The evidence showed that Johnson not only had expert knowledge as to how to create the police reports in a way that could go undetected, but he also had access to the blank police forms that made the concealment of the reports possible. And because there was no evidence of any hesitation on his part or any evidence that he was manipulated into committing criminal acts, it is clear the evidence did not

support an entrapment defense. Accordingly, the first assignment of error is overruled.

## B. Testimony Pertaining to Bribery

{¶ 30} In the second assignment of error, Johnson argues the trial court erred by refusing to instruct Roth to refrain from using the word "bribe" or "bribery payment" in response to questions that were not specifically related to bribe payments.

{¶ 31} Johnson objected to the testimony at trial. In *State v. Jones*, 2020-Ohio-3051, the Ohio Supreme Court noted that "Ohio's criminal law distinguishes between errors that a defendant objects to at trial and those that he or she fails to raise at trial." *Id.* at ¶ 17. In contrast to plain-error review, which applies when the defendant fails to object, we apply a harmless-error analysis when the defendant objects to an error. *Id.*, citing *State v. Perry*, 2004-Ohio-297, ¶ 16.

{¶ 32} Crim.R. 52(A) governs harmless errors and provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the state always bears the burden of demonstrating that the error did not affect the outcome of the trial-court proceedings." *Jones* at ¶ 3.

{¶ 33} Johnson argues that Roth used the terms "bribe" or "bribe payment" 15 times at trial. However, neither Johnson nor Harris objected to those words until after Roth had used them 11 times. (Tr. 1043, 1044, 1073, 1077, 1108, 1109, 1137, and 1138.) Thereafter, defense counsel asked the court to instruct Roth to stop using

the word bribe. In response, the court indicated that it would instruct Roth to answer with a "yes" or "no" response if such a response were called for but that it could not otherwise "instruct the witness how to answer[.]" (Tr. 1228.)

{¶ 34} Johnson's asserts that the Roth's use of the words "bribe" and "bribery payment" was inappropriate because those words state a legal conclusion. However, where a witness's words have "no separate legal relevance apart from their common usage," they are neither legal terms nor legal conclusions. *United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir. 1995).

{¶ 35} The term "bribe" is a plain and commonly used word in the English language. In fact, it was used 237 times during the trial without requiring a definition. Therefore, Roth's use of the word "bribe" was a factual statement consistent with its common definition and was not a legal conclusion.

{¶ 36} Furthermore, even if Roth had avoided the words "bribe" or "bribery payment," the outcome of the trial would not have been any different. The overwhelming evidence established that Johnson helped create fake police reports in exchange for money. Therefore, even if the trial court's decision to not admonish Roth and/or instruct him on how to answer questions was in error, the error was harmless beyond a reasonable doubt.

{¶ 37} The second assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 38} In the third assignment of error, Johnson argues his convictions are against the manifest weight of the evidence.

{¶ 39} In a manifest-weight challenge, the reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Burks*, 2018-Ohio-4777, ¶ 47 (8th Dist.), quoting *Thompkins* at 388.

{¶ 40} Johnson was convicted of two counts of bribery in violation of R.C. 2921.02(B), which states:

> No person, either before or after the person is elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official, shall knowingly solicit or accept for self or another person any valuable thing or valuable benefit to corrupt or improperly influence the person or another public servant or party official with respect to the discharge of the person's or the other public servant's or party official's duty.

{¶ 41} Johnson argues there is no evidence that he knew Harris and Riley were conspiring to create fake police reports in order to commit insurance fraud. He contends he was an unknowing participant in Harris's scheme to take bribes from Riley.

{¶ 42} However, Johnson's convictions are not dependent on his knowledge of any insurance scheme or Harris's separate dealings with Riley. His convictions

are based solely on his position as a police officer in the East Cleveland Police Department and his acceptance of cash in exchange for police reports. Video evidence showed Johnson accepting cash from Riley in exchange for the reports on at least two occasions. And, despite Johnson's argument to the contrary, Johnson played along when Harris introduced him to Riley as Nevels.

{¶ 43} The video evidence also unequivocally showed Johnson reassuring Riley that the police reports looked legitimate for purposes of Riley's insurance claims. Therefore, Johnson's claim that he was completely unaware of Riley and Harris's conspiracy is not supported by the evidence. The fact that the jury acquitted Johnson of the insurance fraud, forgery, and pattern of corrupt activity charges does not change that fact. Johnson's voice is clearly heard on the video footage presented in State's exhibit No. 301, confirming that the reports were "the real deal." And Riley confirmed that he paid Johnson "in exchange for the police reports." (Tr. 729.) Furthermore, Johnson admitted in his interview with Roth that he had previously lied about not accepting bribes in exchange for the reports. Therefore, this is not a rare case in which the jury clearly lost its way and created such a manifest miscarriage of justice that Johnson's convictions must be reversed and a new trial ordered.

{¶ 44} The third assignment of error is overruled.

{¶ 45} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)