[Cite as *State v. Harris*, 2024-Ohio-5808.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,       :

                                      No. 113618

    v.                        :

VON HARRIS,                       :

    Defendant-Appellant.      :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** December 12, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-683800-B

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon Piteo, Gregory Mussman, and Samantha Sohl, Assistant Prosecuting Attorneys, *for appellee.*

Edward M. Heindel, *for appellant.*

WILLIAM A. KLATT, J.:

{¶ 1}   Defendant-appellant Von Harris ("Harris") appeals his conviction and sentence following a jury trial.[1]   For the following reasons, we affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

**Factual and Procedural History**

{¶ 2}   The jury found Harris guilty of bribery, forgery, and insurance fraud based upon Harris allegedly facilitating payment to an East Cleveland police officer in exchange for police reports, forging signatures on police reports, and creating false police reports to recover insurance proceeds.   Harris worked as an East Cleveland police officer from 1997 through November 2017, although he was no longer so employed when he committed the alleged offenses.   Harris's alleged actions were taken at the request of George Michael Riley, Sr. ("Riley") who, unbeknownst to Harris, was an FBI informant.

**George Michael Riley**

{¶ 3}   Starting in 2015 or 2016, Riley owned and operated several businesses in East Cleveland, Ohio including a demolition business.   As part of his business operations, Riley testified that he "did whatever the mayor asked him to do" or paid cash to public officials.   Riley stated he completed work at private homes or lent money to city employees, including firemen and policemen, and in return,

---

[1] This appeal is a companion case to the appeal in *State v. Johnson*, 8th Dist. Cuyahoga No. 113591.

Riley received special favors or work assignments from the City of East Cleveland or the Cuyahoga County Land Bank that earned him millions of dollars.

{¶ 4} Riley testified that Harris, while employed as an East Cleveland police officer, completed favors for him such as checking the police department's Law Enforcement Automated Data System ("LEADS computer system") to see if any warrants had been issued for Riley and facilitating the movement of Riley's construction equipment through the city streets. Riley also stated that he loaned Harris money and Riley's fiancée, who worked at a bank, helped Harris obtain a car loan.

**Von Harris**

{¶ 5} Harris testified that he met Riley in 2015 or 2016 while Harris worked as an East Cleveland police officer. Harris denied asking Riley for money or accepting financial favors from Riley during his tenure as a police officer. Harris testified that he obtained a car loan — based upon his own income and credit — at the credit union where Riley's fiancée worked. Harris testified that he did not observe Riley bribe East Cleveland officials until after he ended his employment with the East Cleveland Division of Police. Harris further testified that after leaving the police force, Riley hired him to work as his part-time office manager and the men discussed working together as business partners in the demolition business. Riley did not pay Harris a salary as an office manager but paid him in cash for completed tasks.

**Special Agent Shaun Roth**

{¶ 6} In May 2017, the Federal Bureau of Investigation ("FBI") began an investigation into corruption in Northeast Ohio with Special Agent Shaun Roth ("Agent Roth") assigned as the task force coordinator. In November 2017, Riley conducted two proffer interviews with the FBI. A proffer interview allows an individual to provide a protected statement. As long as the statement is truthful, it will not be used against the individual and the individual may avoid criminal liability by assisting law enforcement. In November 2017, Riley informed the FBI about bribes he presented to East Cleveland officials and his relationship with Harris. In December 2017, Riley expounded on his alleged quid pro quo relationship with Harris. Riley told Agent Roth that while Harris was a police officer, he accepted money from Riley and, in exchange, Harris checked the LEADS computer system for outstanding warrants on Riley; blocked roads so that Riley could move his construction equipment through the city; and "helped" Riley's drivers if they were pulled over by East Cleveland police officers. The FBI found Riley truthful — despite his criminal record including theft, defrauding creditors, grand theft, criminal simulation, false statements on a bank loan, unauthorized use of property, and misdemeanor theft — and engaged Riley as a confidential human source ("informant") to further their investigation of public corruption in the East

Cleveland Division of Police. As an informant, Riley consented to the FBI monitoring his text messages and cell phone calls.

{¶ 7} In April 2018, three vehicles — a 1995 Ford bus, a 2003 Dodge Ram truck, and a 2004 Dodge Ram truck — were allegedly stolen from Riley's East Cleveland office. Agent Roth testified that the FBI suggested Riley file a police report for the stolen vehicles with the East Cleveland Division of Police just as any other victim would do. Agent Roth further testified that Riley and Harris had a telephone conversation that discussed Riley paying for incident reports related to the stolen vehicles.

{¶ 8} The FBI used surveillance and recording devices to observe and record Riley and Harris's meetings and conversations and subpoenaed Harris's phone records to observe the dates, times, and phone numbers of incoming and outgoing phone calls and messages on his mobile phone.

{¶ 9} Agent Roth testified about Harris and Riley's conversations in May 2018. On May 17, 2018, Harris advised Riley that he had a possible lead on the driver responsible for the theft of Riley's vehicles. Riley asked Harris if he could have someone "run the license plate" and shortly after that Harris contacted an East Cleveland police officer, Demarkco Johnson ("Officer Johnson"). Harris and Officer Johnson had had no prior contact via mobile phone between May 1, 2018, and May 16, 2018, suggesting Harris contacted Officer Johnson to "run the license plates." Around May 23, 2018, Riley asked Harris about the status of his stolen bus, and the discussion led to Riley requesting from Harris incident reports for the stolen

vehicles. During a mobile phone call between Harris and Riley on June 7, 2018, Harris and Riley discussed the dollar amounts Riley would pay Harris's East Cleveland police contacts for an incident report. Agent Roth testified that it was Harris's idea to offer money for the reports.

**June 7, 2018 Incident Report**

{¶ 10} Per Harris, following the theft of Riley's three vehicles, Riley requested from Harris incident reports of the stolen vehicles. On June 7, 2018, Harris filed an incident report for the stolen bus ("June 7 incident report") with Officer Drish of the East Cleveland Division of Police. At the bottom of the incident report, Wilbert Nevels ("Nevels") was listed as the reviewing supervisor. Harris told Riley that Kawanga Patrick ("Patrick"),[2] an East Cleveland dispatcher, helped him prepare the June 7 incident report. Upon receipt of the June 7 incident report, Riley wanted to pay Nevels and Patrick for their efforts.

{¶ 11} In June 2018, Harris did not know Riley was working as an informant for the FBI. Riley did not realize that Harris completed the June 7 incident report on his own and only claimed Patrick and Nevels provided assistance so that he could obtain more money from Riley.

{¶ 12} On June 13, 2018, Harris provided Riley with a copy of the June 7 incident report, and Riley insisted on meeting Patrick and Nevels to pay them individually for their help. Riley's request was based upon the FBI's request that he

---

[2] Kawanga Patrick was also referred to as Kwan Davenport.

pay Patrick and Nevels directly rather than handing all the money over to Harris. Riley met Harris and Patrick at the 55th Street Diner and paid them each $200.

{¶ 13} Later that same day, Riley and Harris met again and drove together to the East Cleveland City Hall where, according to Harris, they unexpectedly met Officer Johnson. Harris stated he decided at that moment to introduce Officer Johnson as Nevels so that Harris could receive additional money from Riley. Harris introduced Officer Johnson as Nevels, and Riley handed Officer Johnson $200 in payment for his alleged assistance with the June 7 incident report. Harris testified that Officer Johnson was surprised when Harris introduced him as "Nevels." None of the charges related to Harris's appeal stem from the June 7 incident report or the events of June 13, 2018.

**False Incident Reports**

{¶ 14} Harris also obtained blank incident reports used by the East Cleveland Division of Police and completed the documents to show the 2003 and 2004 Dodge Ram trucks were stolen (incident report Nos. 18-02217 and 18-02218 or "false incident reports").[3] The false incident reports, dated June 19, 2018, were signed by "Will Nevels" as the reporting officer.

---

[3] Conflicting trial testimony was introduced as to whether Officer Johnson provided the blank incident report forms to Harris or Harris obtained the blank forms on his own. Whether Harris received the blank forms from Officer Johnson may have been relevant to Officer Johnson's defense at trial and the charges of conspiracy against Officer Johnson and Harris. Because the jury found Harris and Officer Johnson not guilty of conspiracy and this appeal relates only to Harris's convictions, how Harris obtained the blank forms is immaterial for purposes of this appeal.

{¶ 15} On June 20, 2018, Harris provided the false incident reports to Riley, and Riley paid Harris for preparing the reports. Riley believed Nevels, whose signature was on the false incident reports, helped facilitate the reports and, therefore, asked to pay Nevels directly for his assistance. Riley did not know the forms were completed solely by Harris, and Nevels was not involved in creating them. Riley and Harris drove together in Riley's truck and met Officer Johnson, who continued to impersonate Nevels, and Riley paid him $200. Upon dropping Harris off at his home, Riley paid Harris $300 — $100 for the false incident reports and $200 to be paid to the East Cleveland dispatcher who supposedly helped create the false incident reports.

**Auto Recovery Reports**

{¶ 16} Based upon the time that had elapsed since the theft of Riley's vehicles and the bribes already accepted by Harris and Officer Johnson, the FBI wanted to see if Harris and Officer Johnson would create fraudulent, stolen vehicle recovery reports. An insured can submit recovery reports to his or her insurance company to receive insurance proceeds. Harris testified that Riley told him the stolen vehicles were insured and pestered him to obtain recovery reports on the vehicles.

{¶ 17} On July 24, 2018, Harris provided Riley with auto recovery report Nos. 18-02463 and 18-02464 ("auto recovery reports") that stated the 2003 and 2004 Dodge Ram trucks were recovered stripped and "burnt out completely." The auto recovery reports further stated the trucks were recovered by Akron police

officer Coleman, badge No. 921, and towed by Miller Towing. The auto recovery reports were signed by "W. Nevels" as the reporting officer, "Nevels" as the investigating officer, and "Johnson" as the approving officer.

{¶ 18} Harris informed Riley that Officer Johnson provided the blank forms for the auto recovery reports while Harris filled in the documents. Riley and Harris discussed that Riley intended to submit the auto recovery reports to his insurance company and recover at least $20,000 for his stolen vehicles. Due to his receipt of the auto recovery reports, Riley paid Harris and Officer Johnson each $500 cash. Following his receipt of his payment on July 24, 2018, Officer Johnson contacted Harris and informed him they were being followed. Officer Johnson told Harris he "didn't want to do this anymore."

{¶ 19} The false incident reports and auto recovery reports were never filed with the police department, entered into the East Cleveland Division of Police's computers, nor submitted to Riley's insurance company.

{¶ 20} On October 10, 2018, and October 11, 2018, the FBI interviewed Harris concerning his interactions with Riley. The interviews were not recorded. Per Agent Roth, Harris initially lied during the interviews when he stated Officer Johnson and Patrick did not keep any of the money Riley paid them. The FBI also interviewed Officer Johnson, and his recorded interview was played at trial.

{¶ 21} On August 11, 2023, a grand jury indicted Harris in a 16-count indictment, and on December 11, 2023, trial commenced. The State introduced surveillance videos and surveillance photographs, and the jury heard testimony

from Harris, Riley, Nevels, Agent Roth, and Patrick that was similar to the facts presented above. Harris repeatedly stated he was responsible for the false incident reports and auto recovery reports, not Officer Johnson. Harris testified that he did not have permission to sign Nevels's name to any of the reports. Harris also testified that he did not believe the false incident reports and auto recovery reports were against the law if they were never entered into the police department's computer system nor submitted to an insurance company. Officer Johnson did not provide any testimony on his own behalf.

{¶ 22} Patrick testified that in 2016 or 2017, she and Harris met Riley in the parking lot of a diner located in Cleveland, Ohio. Riley handed Patrick $200 cash and when she and Harris returned to Harris's vehicle, she immediately handed the money over to Harris. Patrick denied she was ever employed as an East Cleveland dispatcher.

{¶ 23} Nevels testified that he served as an East Cleveland police officer from 2001 through May 2023, and he worked with Harris at the police department from 2001 through 2013 or 2014. Nevels testified that he was the reviewing supervisor who signed off on the June 7 incident report. Nevels confirmed that the June 7 incident report was entered into the LEADS computer system, and he did not receive any compensation from Riley related to the completion of that report.

{¶ 24} Nevels testified that he did not prepare the false incident reports or auto recovery reports provided to Riley on June 20, 2018, and July 24, 2018, respectively. Nevels further testified that the false incident reports and auto

recovery reports do not reflect his handwriting, signature, or accurate badge number. Nevels stated that he did not provide Harris or Officer Johnson permission to complete or sign his name on the false incident reports and auto recovery reports.

{¶ 25} At the close of the State's evidence and following Harris's testimony, Harris presented Crim.R. 29 motions that the trial court denied. The trial court also denied Harris's request for a jury instruction on entrapment. The jury returned guilty verdicts on Counts 5 and 10, bribery in violation of R.C. 2921.02(B); Counts 6, 8, 11, and 13, forgery in violation of R.C. 2913.31(A)(1); Counts 7, 9, 12, and 14, forgery in violation of R.C. 2913.31(A)(2); Count 15, insurance fraud in violation of R.C. 2913.47(B)(2); and found Harris not guilty on all remaining charges.

{¶ 26} On January 23, 2024, the trial court sentenced Harris. The attorneys agreed that Counts 6 and 7, Counts 8 and 9, Counts 11 and 12, and Counts 13 and 14 merged for purposes of sentencing, and the State elected to have Harris sentenced on Counts 6, 8, 11, and 13. The trial court sentenced Harris to six months in the county jail on Count 15; 12 months in prison on Counts 6, 8, 11, and 13; and 24 months in prison on Counts 5 and 10, with all counts running concurrent to one another for a total of 24 months in prison.

{¶ 27} On February 5, 2024, Harris filed a timely notice of appeal presenting five assignments of error:

> Assignment of Error I: The trial court erred when it declined to instruct the jury on the defense of entrapment.
>
> Assignment of Error II: The trial court committed plain error in admitting Harris' phone records as they were seized illegally without a

warrant in violation of the holding in *Carpenter v. United States*, 585 U.S. 296, 138 S.Ct. 2206 (2018).

Assignment of Error III:  The defendant was denied his right to the effective assistance of counsel because counsel did not move to suppress the phone records.

Assignment of Error IV:  The convictions were not supported by sufficient evidence.

Assignment of Error V:  The convictions were against the manifest weight of the evidence.

**Legal Analysis**

**Sufficiency of the Evidence**

{¶ 28} For ease of discussion, we will address Harris's assignments of error out of order.  In his fourth assignment of error, Harris argues his convictions were not supported by sufficient evidence.

{¶ 29} A sufficiency-of-the-evidence challenge requires a determination of whether the State has met its burden of production at trial.  *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997).  An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"  *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction.  *State*

*v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 30} In a sufficiency inquiry we assume the State's witnesses testified truthfully and evaluate whether that testimony, along with any other evidence introduced at trial, satisfies each element of the offense. *In re D.R.S.*, 2016-Ohio-3262, ¶ 23 (8th Dist.). The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Direct evidence and circumstantial evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

**Bribery**

{¶ 31} The jury found Harris guilty of Counts 5 and 10, bribery in violation of R.C. 2921.02(B). [4] Harris argues that after viewing the evidence most favorably to the prosecution, no rational trier of fact could have found the essential elements of the crime — bribery — proven beyond a reasonable doubt. Specifically, Harris contends that he was not employed as a police officer at the time of the alleged offense and, therefore, he was not subject to R.C. 2921.02(B). Harris also contends that Riley paid him for his services, including obtaining police reports on June 20, 2018, and July 24, 2018, and no public official benefitted from those acts.

---

[4] The State's appellate brief indicates the jury found Harris guilty of bribery on Counts 4, 5, and 10. A review of the record shows the jury found Harris guilty of bribery on Counts 5 and 10 and not guilty on Count 4.

{¶ 32} The State contends Harris's arguments mistakenly focus on whether his acceptance of compensation constituted bribery. The State argues bribery occurred not when Harris received money from Riley but when Harris facilitated payments by Riley to Officer Johnson, a public servant, for the completion of the false incident reports and auto recovery reports. The State further argues that R.C. 2921.02(B) does not limit bribery to "a person in an elected, appointed, or otherwise sworn position accepting a thing of value." Appellee's brief, p. 27.

{¶ 33} R.C. 2921.02(A) and (B) are relevant to this discussion and state:

(A) No person, with purpose to corrupt a public servant or party official, or improperly to influence a public servant or party official with respect to the discharge of the public servant's or party official's duty, whether before or after the public servant or party official is elected, appointed, qualified, employed, summoned, or sworn, shall promise, offer, or give any valuable thing or valuable benefit.

(B) No person, either before or after the person is elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official, shall knowingly solicit or accept for self or another person any valuable thing or valuable benefit to corrupt or improperly influence the person or another public servant or party official with respect to the discharge of the person's or the other public servant's or party official's duty.

{¶ 34} The record demonstrates Harris was charged under R.C. 2921.02(B) — not R.C. 2921.02(A) — and the State argued to the trial court and presented its evidence in support of R.C. 2921.02(B). Counts 5 and 10 of the indictment charged Harris with bribery in violation of R.C. 2921.02(B), and stated:

Von Harris did knowingly solicit or accept for himself or another person any valuable thing or valuable benefit, to wit: US Currency, to corrupt or improperly influence East Cleveland Police Department and/or its officers or another public servant or party official with

respect to the discharge of his or the other public servant's or party official's duty, either before or after he was elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official.

{¶ 35} During Harris's Crim.R. 29 motion, Harris's counsel argued Harris was not exercising any duty as a police officer when the alleged offenses occurred and the State failed to satisfy the elements of bribery as detailed in the indictment. In contrast, the State argued that Harris's employment as a police officer was immaterial since the statute states the acts could occur before or after the individual took their oath as a public servant:

> It does not matter that Von Harris was not an officer at the time, your Honor. You'll see in the bribery statute it actually says, "Before or after they took their oath as a public servant." Also, the corruption could be on the East Cleveland Police Department, its officers, or Demarkco Johnson just by their statements alone that were presented through Agent Roth, I believe the briberies are met.

Tr. 1340-1341.

{¶ 36} The trial court instructed the jury on bribery and referenced R.C. 2921.02(B):

> Count 4, 5 and 10, bribery. The defendants, Demarkco Johnson and Von Harris, are charged with bribery in violation of 2921.02(B) in Counts 4, 5 and 10 of the indictment. Before you can find the defendants guilty, you must find beyond a reasonable doubt that on or about June 13th of 2018, Count 4; June 20th of 2018 in Count 5; and July 24th, 2018, Count 10, and in Cuyahoga County, Ohio, the defendants, Demarkco Johnson and Von Harris, knowingly solicit or accept for themselves or another person any valuable thing or valuable benefit, to wit: U.S. currency, to corrupt or improperly influence East Cleveland Police Department and/or its officers or another public servant or party official with respect to the discharge of his or the other public servant's or party official's duty, either before or after he was

elected, appointed, qualified, summoned, or sworn as a public servant, or a party official.

Tr. 1559-1560. The jury found Harris guilty of bribery, in violation of R.C. 2921.02(B), and the trial court's January 22, 2024 sentencing judgment entry states Harris was sentenced on Counts 5 and 10 in violation of R.C. 2921.02(B).

{¶ 37} A plain reading of R.C. 2921.02(B) indicates that the statute applies when a public official knowingly solicits or accepts for himself a valuable benefit that improperly influences the public official's performance of his public duty either before or after the public official assumes his public position. We disagree with the State's argument that R.C. 2921.02(B) can apply to an individual who is no longer a public official when the alleged criminal conduct occurred. Here, there is no dispute that Harris was not employed as a police officer at the time of the alleged bribery. We note that the State conceded in oral argument that Harris could have been charged under R.C. 2921.02(A). That statute applies when a person (such as Harris) offers or gives a valuable benefit to a public official for the purpose of improperly influencing the public official's performance of their public duty. However, as previously noted, Harris was not charged with or convicted of violating R.C. 2921.02(A).

{¶ 38} During oral argument, the State contended that we should affirm Harris's R.C. 2921.02(B) bribery convictions because Harris was complicit in officer Johnson's violation of that statute. Complicity, however, is a separate criminal

offense (R.C. 2923.03) for which Harris was not convicted. Therefore, the State's argument lacks merit.

{¶ 39} Because the State failed to prove Harris violated R.C. 2921.02(B), his bribery convictions must be vacated. *See State v. Schultz*, 1993 Ohio App. LEXIS 797 (11th Dist. Feb. 12, 1993) (Where the State inadvertently charged and convicted Schultz under the wrong code section, Schultz's convictions were reversed.); *but see State v. Byrd*, 2004-Ohio-7127 (1st Dist.) (Where the indictment and bill of particulars informed defendant of the essential elements of the offense charged against him even though they named the wrong code section, the record contained evidence from which the trier of fact could conclude that the State proved all elements of the correct code section, and the jury was charged on the correct code section, there were no grounds for reversal of the conviction.).

{¶ 40} Thus, there was insufficient evidence to support the bribery convictions against Harris and, accordingly, we vacate those convictions and remand for proceedings consistent with this opinion.

**Forgery**

{¶ 41} As to the allegations of forgery, the jury found Harris guilty of forgery pursuant to Counts 6, 8, 11, and 13 in violation of R.C. 2913.31(A)(1) and Counts 7, 9, 12, and 14 in violation of R.C. 2913.31(A)(2) that reads:[5]

> (A) No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:

---

[5] The court merged Counts 6 and 7, Counts 8 and 9, Counts 11 and 12, and Counts 13 and 14, and the State opted to have Harris sentenced on Counts 6, 8, 11, and 13.

(1) Forge any writing of another without the other person's authority;

(2) Forge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what in fact was the case, or to be a copy of an original when no such original existed. . . .

{¶ 42} "Defraud" means to "knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(B).

{¶ 43} "Deception" means "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).

{¶ 44} "'Forge' means to fabricate or create, in whole or in part and by any means, any spurious writing, or to make, execute, alter, complete, reproduce, or otherwise purport to authenticate any writing, when the writing in fact is not authenticated by that conduct." R.C. 2913.01(G).

{¶ 45} The record shows that Harris conceded he prepared the false incident reports and auto recovery reports. Harris obtained the East Cleveland incident reports and auto recovery reports without the authority to do so. The testimony also demonstrated that Harris signed Nevels's name to the false incident reports and auto recovery reports, and Nevels never granted Harris permission to do so.

Further, the information contained in the auto recovery reports, including the fact that the vehicles were towed by Miller's Towing and the burned and stripped vehicles were discovered by Officer Coleman of the Akron Division of Police, was false.

{¶ 46} Harris testified that the information contained in the false incident reports was correct — meaning that the 2003 and 2004 Dodge Ram trucks were, in fact, stolen — and he never filed the reports with the East Cleveland Division of Police. However, those facts did not negate the jury's finding that Harris was guilty of forgery. The evidence demonstrated that Harris signed the four reports with Nevels's signature without having authority to do so and presented them to Riley under the premise that Nevels signed the documents. There was sufficient evidence to support the forgery convictions as charged under R.C. 2913.31(A)(1) and (A)(2).

**Insurance Fraud**

{¶ 47} The jury found Harris guilty of insurance fraud in violation of R.C. 2913.47(B)(2) that reads:

> (B) No person, with purpose to defraud or knowing that the person is facilitating a fraud, shall do either of the following:
>
> . . .
>
> (2) Assist, aid, abet, solicit, procure, or conspire with another to prepare or make any written or oral statement that is intended to be presented to an insurer as part of, or in support of, an application for insurance, a claim for payment pursuant to a policy, or a claim for any other benefit pursuant to a policy, knowing that the statement, or any part of the statement, is false or deceptive.

{¶ 48} The record shows that Harris was told the auto recovery reports would be submitted to Riley's insurance company so that Riley could recover insurance proceeds, and Harris created the auto recovery reports to be submitted for that purpose. The record also demonstrates that the auto recovery reports were not submitted to Riley's insurance company. Based upon the fact that the reports were not submitted to an insurance company, Harris argues there was insufficient evidence to support the conviction of insurance fraud.

{¶ 49} We find Harris's actions satisfied the elements of R.C. 2913.47(B)(2) when he created the auto recovery reports knowing that Riley intended to present those documents to Riley's insurance carrier to make a false claim. The statute is broad in nature and includes Harris's actions even if no report was ultimately presented to the insurance carrier. *See State v. Branch*, 2009-Ohio-3946, ¶ 60 (2d Dist.) (Due to the statute's broad language, defendant could be found guilty under R.C. 2913.47(B)(2) even though he neither owned the alleged damaged truck nor was an insured under the policy.). Thus, there was sufficient evidence to support the insurance fraud conviction as charged under R.C. 2913.47(B)(2).

{¶ 50} In regard to Harris's fourth assignment of error, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of forgery and insurance fraud proven beyond a reasonable doubt but the essential elements of bribery were not proven. We sustain Harris's fourth assignment of error as it relates to the bribery charges in Counts 5 and 10, vacate the bribery convictions and sentence, and remand with instructions for the

trial court to issue a judgment dismissing Harris's bribery convictions. We overrule Harris's fourth assignment of error as it relates to the charges of forgery and insurance fraud.

{¶ 51} Pursuant to our sustaining Harris's sufficiency of the evidence argument on his bribery convictions, we will not address bribery in the remaining assignments of error.

**Entrapment**

{¶ 52} In his first assignment of error, Harris contends that the trial court erred when it declined to instruct the jury on the affirmative defense of entrapment. Specifically, Harris argues the evidence showed the criminal plan for which he was charged originated from the FBI and Harris had no disposition to commit any crimes. "When an accused raises the defense of entrapment, the commission of the offense is admitted and the accused seeks to avoid criminal liability therefor by maintaining that the government induced him to commit an offense that he was not predisposed to commit." *State v. Doran*, 5 Ohio St.3d 187, 193 (1983).

{¶ 53} "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder." *State v. Stephens*, 2016-Ohio-384, ¶ 17 (8th Dist.), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case[,] and if reasonable minds might reach the conclusion sought by the requested instruction." *State v.*

*Jacinto*, 2020-Ohio-3722, ¶ 42 (8th Dist.), citing *State v. Adams*, 2015-Ohio-3954, ¶ 240, and *State v. Crawford*, 2016-Ohio-7779, ¶ 14 (8th Dist.). When determining if a jury instruction on an affirmative defense should have been given, the reviewing court views the evidence in a light most favorable to the defendant without considering credibility. *Jacinto* at ¶ 42, quoting *State v. Sullivan*, 2020-Ohio-1439 ¶ 45 (11th Dist.), quoting *State v Belanger*, 2010-Ohio-5407, ¶ 6 (3d Dist.). This court reviews a trial court's refusal to provide a requested jury instruction for an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64 (1989).

{¶ 54} Here, Harris requested a jury instruction on the affirmative defense of entrapment that the trial court refused to provide. Harris had the burden of proving the defense by a preponderance of the evidence. *Doran* at 193.

{¶ 55} Entrapment is established when an accused proves "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." *Doran*, at paragraph one of the syllabus. Ohio defines entrapment under a subjective test. *Id.* at 191. The subjective test focuses on the accused's predisposition to commit an offense and places emphasis on the accused's criminal culpability rather than the culpability of the police officer. *Id.* at 192. "Entrapment does not occur when 'it is shown that the [offender] was predisposed to commit the offense,' and the government 'merely afford[s] opportunities or facilities for the commission of the offense.'" *State v. Carver*, 2022-

Ohio-3238, ¶ 12 (8th Dist.), quoting *Doran*. Courts generally review this nonexhaustive list of factors to establish predisposition:

> (1) The accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to [become involved] in criminal activity.

*Carver*. No single factor controls over another. *Id.*

{¶ 56} Here, the record does not demonstrate that Harris was previously involved in forgery or insurance fraud. Therefore, the first factor in determining predisposition mitigates against finding that Harris was predisposed to commit these offenses. However, this is only the first factor and courts have also recognized that "a first-time offender can be predisposed to commit a crime just as surely as a repeat offender can." *United States v. Martin*, 780 Fed. Appx. 248, 252 (6th Cir.2019), citing *United States v. Gordon*, 844 F.2d 1397, 1406 (9th Cir.1988). "The pertinent question is 'whether the government overcame the will of a reluctant, otherwise law-abiding person.'" *Carver* at ¶ 15 (8th Dist.), quoting *Martin* at 252, citing *Jacobson v. United States*, 503 U.S. 540, 553-554 (1992), and *United States v. Barger*, 931 F.2d 359, 367 (6th Cir. 1991). The remaining factors support Harris's predisposition and, therefore, the trial court's decision not to instruct the jury on entrapment.

{¶ 57} The evidence shows Harris readily acquiesced to the offered inducements. Harris filed the June 7 incident report and created the false incident

reports and recovery reports and received money for those efforts on his own behalf as well as for the alleged efforts of Patrick and Nevels. We note that Harris testified that Riley asked "at least 20 times" for the auto recovery reports. Harris obtained the blank incident reports and auto recovery forms — either on his own or through Officer Johnson — then prepared the reports with false information and forged signatures and provided them to Riley for payment. And while preparing the various reports, Harris continued to introduce Officer Johnson as Nevels, and seek payment on his behalf.

{¶ 58} Harris exhibited an expert knowledge of the charged crimes, and the evidence showed he took the necessary steps to commit the crimes of forgery and insurance fraud. Based upon his prior employment as an East Cleveland police officer, Harris knew he needed to obtain blank East Cleveland incident reports and auto recovery reports. Harris had access to those blank forms and secured them. Harris knew what information should be included in the blank forms, and he completed the false incident reports and auto recovery reports accordingly. Harris demonstrated a willingness to involve himself in the criminal activity. Harris provided the false incident reports and auto recovery reports, accepted money for those documents, and facilitated Riley's payments to Officer Johnson for his alleged assistance with the false documents on June 20, 2018, and July 24, 2018.

{¶ 59} Collectively, we find the evidence demonstrated a predisposition on the part of Harris. Thus, the trial court did not abuse its discretion when it declined

to instruct the jury on the affirmative defense of entrapment, and Harris's first assignment of error is overruled.

**Admission of Cell Phone Records**

{¶ 60} In his second assignment of error, Harris argues the State violated his Fourth Amendment rights when it obtained his mobile phone records and cell phone site location information ("CSLI") pursuant to a subpoena rather than a search warrant.

{¶ 61} Harris did not object to the introduction of the phone records below. Accordingly, we review this claim for plain error. Crim.R. 30; Crim.R. 52(B). Under Crim.R. 52(B), a plain error affecting a substantial right may be noticed on appeal even though it was not brought to the trial court's attention. To constitute plain error, there must be an error that is plain or obvious that affected the outcome of the case. *In Re: J.G.*, 2013-Ohio-583, ¶ 10 (8th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *State v. Harrison*, 2009-Ohio-3547, ¶ 61, (an error rises to the level of plain error only if, "'but for the error, the outcome of the trial clearly would have been otherwise'"), quoting *State v. Long*, 53 Ohio St.2d 91, 97 (1978). Notice of plain error "'is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *Barnes*, quoting *Long*.

{¶ 62} Specifically, Harris contends, pursuant to *Carpenter v. United States*, 585 U.S. 296 (2018), that the State's seizure of his mobile phone records and CSLI without a warrant establishing probable cause was a violation of his Fourth

Amendment rights and, therefore, the phone records should not have been admitted at trial.

{¶ 63} Harris's contention that *Carpenter* requires the State to issue a warrant, supported by probable cause, to obtain phone records and CSLI is incorrect. The *Carpenter* Court held that an individual has a legitimate expectation of privacy in his physical movements as captured by CSLI and, generally, the government must issue a warrant before receiving CSLI. However, the *Carpenter* holding did not extend to phone records that it classified as information voluntarily turned over to a third party. *Carpenter* at 308, quoting *Smith v. Maryland*, 442 U.S. 735, 743 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."). A subpoena, rather than a warrant, is sufficient to obtain cell phone records. *See State v. Griffin*, 2013-Ohio-416, ¶ 9 (9th Dist.); *State v. Neely*, 2012-Ohio-212, ¶ 13-27 (2d Dist.) (probable cause warrant not required when the police subpoena cell phone records from defendant's third-party provider).

{¶ 64} Further, in the instant matter, the State obtained only the mobile phone records of Harris — not CSLI — and a subpoena was sufficient to secure those records. We need not assess whether the State properly subpoenaed the phone records because Harris has not raised this issue on appeal. *See* App.R. 16(A)(7).

{¶ 65} Harris held no privacy right in his mobile phone records, and the trial court did not commit plain error when it allowed their admission at trial. Thus, Harris's second assignment of error is overruled.

**Effective Assistance of Counsel**

{¶ 66} In his third assignment of error, Harris argues that his convictions must be reversed because he received ineffective assistance of counsel. Specifically, Harris argues that his counsel was ineffective because he failed to attempt to suppress the mobile phone records.

{¶ 67} Ohio Const. art. 1, § 10 and U.S. Const. amend. VI provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

{¶ 68} To establish ineffective assistance of counsel, Harris must demonstrate that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland* at 687.

{¶ 69} As discussed above in response to Harris's second assignment of error, Harris's phone records were properly admitted at trial. Thus, we cannot find that defense counsel's failure to attempt to suppress the records was ineffective or deficient. Additionally, the record includes witness testimony, surveillance videos, surveillance photographs, and Officer Johnson's interview that supported the jury's verdict. Even if the phone records had been suppressed, the trial outcome would not have been different. Harris has not met either prong of the *Strickland* test and, therefore, his third assignment of error is without merit and is overruled.

**Manifest Weight of the Evidence**

{¶ 70} In his fifth assignment of error, Harris contends that his convictions were against the manifest weight of the evidence.

{¶ 71} A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d 380 at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at 390. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*. Reversal of a trial court's "judgment on manifest weight of the evidence requires the unanimous concurrence of all three appellate judges." *State v. Crumbley*, 2010-Ohio-3866, ¶ 20 (8th Dist.), citing *Thompkins* at paragraph four of the syllabus.

{¶ 72} In challenging the weight of the evidence supporting his convictions, Harris argues that no reasonable factfinder could have identified Harris as the perpetrator of the charged crimes. After a thorough review of the record, and weighing all the evidence, we cannot say that this is one of the rare cases in which the trier of fact lost its way. Harris's forgery and insurance fraud convictions were not against the manifest weight of the evidence and, thus, we overrule his fifth assignment of error.

{¶ 73} Judgment affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion.

It is ordered that the parties split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
WILLIAM A. KLATT, JUDGE*

EILEEN T. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)